UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
THE HINDU TEMPLE SOCIETY OF NORTH AMERICA,      :
a New York religious corporation; NARENDRA          04 CV 3342
DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; :      (RJD)
HYMA REDDY; DR. PATHMINI PANCHACHARAM;
DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY    :
ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM
DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA      :
MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY
KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH     :
SHANTILAL PANCHAL; RAJ GOPAL IYER,

                                                :

                    Plaintiffs,

                                                :

          - against-

                                                :

THE SUPREME COURT OF THE STATE OF NEW YORK,
ANTHONY J. PIACENTINI, in his official          :
capacity; JOSEPH G. GOLIA, in his official
capacity; SAMBASIVA RAO VENIGALLA;              :
KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA,
NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER,     :
and VASANTRAI M. GANDHI,

                                                :

                    Defendants.
--------------------------------------------X

**STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

                         ELIOT SPITZER
                         Attorney General of the
                          State of New York
                         <u>Attorney for the State Defendants</u>
                         120 Broadway
                         New York, New York 10271
                         (212) 416-8405/8610

AMY HELD
JEFFREY METZLER
CONSTANTINE SPERES
Assistant Attorneys General

ROBERT H. EASTON
JEAN LIN
Assistant Solicitors General
 <u>of Counsel</u>

# Table of Contents

**Page**

Preliminary Statement . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . 2

The Underlying Facts . . . . . . . . . . . . . . . . . . . 2

    A.    The State Proceeding . . . . . . . . . . . . . . . . 2

        1.    The Petition In The State Proceeding . . . . . . 4

        2.    The Society's Membership Claims
            During Securitization of Millions In Debt . . . 5

        3.    Justice Golia's February 14, 2002 Order . . . . 6

        4.    The Appellate Division's
            August 25, 2003 Decision . . . . . . . . . . . 7

        5.    Justice Golia's October 23, 2003 Order . . . . . 9

        6.    Justice Golia's December 12, 2003 Order . . . . 9

        7.    Plaintiffs-State Respondents'
            December 18, 2003 Letter . . . . . . . . . . 10

        8.    The Referee's January 6, 2004 Interim Report . 11

        9.    Justice Golia's April 7, 2004 Order . . . . . 14

        10.    Justice Golia's May 18, 2004 Order . . . . . 14

        11.    The Appellate Division Refused to Stay
            The Proceedings Before the Referee . . . . . . 14

        12.    Justice Golia's June 10, 2004 Order . . . . . 15

        13.    Justice Golia's July 7, 2004 Order . . . . . 16

        14.    Justice Golia's July 13, 2004 Order . . . . . 16

        15.    The Appellate Division Refused to Stay
            the June 10, 2004 Order . . . . . . . . . . 17

    B.    Plaintiffs File The Instant Federal Action . . . . 17

ARGUMENT   -   PLAINTIFFS' APPLICATION FOR A
               PRELIMINARY INJUNCTION SHOULD BE
               DENIED . . . . . . . . . . . . . . . . . . . . 18

I.   Plaintiffs Have Not Demonstrated
     Irreparable Injury . . . . . . . . . . . . . . . . . . 20

II.  Plaintiffs Cannot Demonstrate
     A Likelihood of Success on the Merits  . . . . . . . . 26

     A.   Plaintiffs' Claims Are Barred
          By Younger Abstention . . . . . . . . . . . . . . 27

     B.   The Rooker Feldman Doctrine Bars This Court From
          Exercising Jurisdiction Over Virtually All Of
          Plaintiffs' Claims  . . . . . . . . . . . . . . . 34

          1.   Plaintiffs' Direct Attack on Prior
               State Court Orders and Judgments . . . . . . 35

          2.   Plaintiffs' "As Applied" Claims Are
               "Inextricably Intertwined" With The
               Decisions Of The State Courts  . . . . . . . 40

          3.   The Rooker-Feldman Doctrine Bars The
               Federal Claims Of The Six Plaintiffs
               Who Were Not Parties to State Proceedings . . 43

     C.   Plaintiffs' Section 1983 Claims Against
          Justice Golia Are Barred By The Doctrine
          Of Absolute Immunity  . . . . . . . . . . . . . . 47

     D.   Plaintiffs' Section 1985 Claims Have No Merit . . . 51

     E.   The Eleventh Amendment Bars Plaintiffs' Claims
          for  Monetary,  Injunctive  and  Declaratory
          Relief Against The Supreme Court of the State
          of New York . . . . . . . . . . . . . . . . . . . 52

     F.   New York's Religious Corporation Law
          Is Constitutional On Its Face . . . . . . . . . . 53

     G.   The State Defendants' Actions
          Pass Constitutional Muster  . . . . . . . . . . . 64

1.  A State Is Entitled To Apply
    "Neutral-Principles" Of Law
    When Adjudicating Disputes Over
    Control Of Property Held By A
    Religious Organization . . . . . . . . . . . . 64

2.  New York State Has Adopted
    The "Neutral-Principles" Method . . . . . . . 69

3.  The State Defendants Have Applied
    "Neutral Principles" To Resolve
    The Dispute Over Control Of The
    Society's Assets . . . . . . . . . . . . . . . 70

4.  Persuasive Authority Supports Defendants'
    Actions Under The First Amendment . . . . . . 77

H.  Plaintiffs' Religious Exercise, Free Speech,
    Freedom of Association, and Due Process Arguments
    Must Fail . . . . . . . . . . . . . . . . . . . 83

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 85

# Table of Authorities

**Cases**                                                                        **Page**

Al-Jundi v. Estate of Rockefeller,
    885 F.2d 1060 (2d Cir. 1989) . . . . . . . . . . . . . . . 53

Bell & Howell: Mamiya Co. v. Masel Supply Co.,
    719 F.2d 42 (2d Cir. 1983) . . . . . . . . . . . . . . . . 20

Bolin v. Story,
    225 F.3d 1234 (10th Cir. 2000) . . . . . . . . . . . . . 50

Bouldin v. Alexander,
    82 U.S. 131 (1872) . . . . . . . . . . . . . . . . . 66, 72

Brundage v. Deardorf,
    55 F. 839 (1893) . . . . . . . . . . . . . . . . . . . . 81

Buechel v. Bain,
    97 N.Y.2d 295, 766 N.E.2d 914, 740 N.Y.S.2d 252
    (N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . 41

Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,
    508 U.S. 520 (1993) . . . . . . . . . . . . . . . . . . . 55

Cleavinger v. Saxner,
    474 U.S. 193 (1985) . . . . . . . . . . . . . . . . . . . 47

Cory v. White,
    457 U.S. 85 (1982) . . . . . . . . . . . . . . . . . . . 53

Diamond "D" Constr. Corp. v. McGowan,
    282 F.3d 191 (2d Cir. 2002) . . . . . . . . . . 27, 28, 33

District of Columbia Court of Appeals v. Feldman,
    460 U.S. 462 (1983) . . . . . . . . . . . . 34, 35, 40, 44

Doran v. Salem Inn, Inc.,
    422 U.S. 922 (1975) . . . . . . . . . . . . . . . . . . . 31

Duvall v. Sharp,
    905 F.2d 1188 (8th Cir. 1990) . . . . . . . . . . . . . 51

Employment Div., Dep't of Human Res. of Oreg. v. Smith,
    494 U.S. 872 (1990) . . . . . . . . . . . . . . . . . . . 55

Fifth Avenue Presbyterian Church v. City of New York,
    293 F.3d 570 (2d Cir. 2002) . . . . . . . . . . . . . . 55

Finn v. County of Albany,
    No. 98-CV-844 (DNH), 1999 WL 291820
    (N.D.N.Y. May 5, 1999) . . . . . . . . . . . . . . . . 50

First Presbyterian Church of Schenectady v. United
    Presbyterian Church,
    62 N.Y.2d 110 (1984) . . . . . . . . . . . . . . . . . 69

Friedman v. Cuomo,
    39 N.Y.2d 81, 346 N.E.2d 799, 382 N.Y.S.2d 961
    (N.Y. 1976) . . . . . . . . . . . . . . . . . . . . 29, 43

Gagliardi v. Village of Pawling,
    18 F.3d 188 (2d Cir. 1994) . . . . . . . . . . . . . . 52

Gan v. City of New York,
    996 F.2d 522 (2d Cir. 1993) . . . . . . . . . . . . . . 53

Greek Orthodox Archdiocese of N. & S. Am. v. Abrams,
    162 Misc. 2d 850, 618 N.Y.S.2d 504 (N.Y. Sup. Ct.
    N.Y. Co. 1994) . . . . . . . . . . . . . . . . . . . . 29

Hachamovitch v. DeBuono,
    159 F.3d 687 (2d Cir. 1998) . . . . . . . . . . . . . . 44

Hartford Courant Co. v. American Lawyer Media, Inc.,
    371 F.3d 49 (2d Cir. 2004) . . . . . . . . . . . . . . 44

Hicks v. Miranda,
    422 U.S. 332 (1975) . . . . . . . . . . . . . . . 31, 33

Idaho v. Coeur d'Alene Tribe of Idaho,
    521 U.S. 261 (1997) . . . . . . . . . . . . . . . . . 52

Islamic Ctr. v. Islamic Science Found.,
    262 A.D.2d 362 (2d Dep't 1999) . . . . . . . . . . . . 80

Jones v. Newman,
    No. 98-CV-7460 (MBM), 1999 WL 493429
    (S.D.N.Y. June 30, 1999) . . . . . . . . . . . . . . . 50

| Cases | Page |
|-------|------|

**Jones v. Wolf,**
    443 U.S. 595 (1979) . . . . . . . . . . . . 67, 68, 69, 75

**Julian v. N.Y.C. Transit Authority,**
    857 F. Supp. 242 (E.D.N.Y. 1994), <u>aff'd</u>, 52 F.3d 312
    (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . 51

**Kampfer v. Scullin,**
    989 F. Supp. 194 (N.D.N.Y.), <u>aff'd</u>, 175 F.3d 1008
    (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 50

**Karageorgious v. Laoudis,**
    271 A.D.2d 653 (2000) . . . . . . . . . . . . . . . . . . . 70

**Kedroff v. St. Nicholas Cathedral,**
    344 U.S. 94 (1952) . . . . . . . . . . . . . . . . . . . 56, 81

**King v. James,**
    No. 91-CV-952, 1991 U.S. Dist. LEXIS 17332 (N.D.N.Y.
    Nov. 29, 1991), <u>aff'd without opin.</u>, 969 F.2d 1041
    (2d Cir. 1992), <u>cert. denied</u>, 506 U.S. 821 (1992) . . 44,46

**Larson v. Valente,**
    456 U.S. 228 (1982) . . . . . . . . . . . . . . . . . . 29, 54

**Lemonds v. St. Louis County,**
    222 F.3d 488 (8th Cir. 2000) . . . . . . . 44, 45, 46, 47

**Malizia v. Westchester County Dist. Attorney's Office,**
    164 F.3d 618 (2d Cir. 1998) . . . . . . . . . . . . . . . . 50

**Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,**
    196 F.3d 409 (2d Cir. 1999) . . . . . . . . . . . . . . . . 57

**Maryland & Virginia Eldership v. Church of God,**
    396 U.S. 367 (1970) . . . . . . . . . . . . 56, 66, 69, 75

**Members of the City Council v. Taxpayers for Vincent,**
    466 U.S. 789 (1984) . . . . . . . . . . . . . . . . . . . . 54

**Mireles v. Waco,**
    502 U.S. 9 (1991) . . . . . . . . . . . . . . . . . . . . . 47

**Molloy v. Metro. Transp. Auth.,**
    94 F.3d 808 (2d Cir. 1996) . . . . . . . . . . . . . . . . 19

| Cases | Page |
|---|---|

Montero v. Travis,
      171 F.3d 757 (2d Cir. 1999) . . . . . . . . . . . 48, 50

Morris v. Scribner,
      69 N.Y.2d 418 (1987) . . . . . . . . . . . . . . . . 82

New York Dist. of Assemblies of God v. Calvary Assembly
      of God,
      64 A.D.2d 311 (3d Dep't 1978) . . . . . . . . . . . 65

New York State Ass'n of Realtors, Inc. v. Shaffer,
      27 F.3d 834 (2d Cir. 1994) . . . . . . . . . . . . . 54

New York State Club Ass'n v. City of New York,
      487 U.S. 1 (1988) . . . . . . . . . . . . . . . . . 54

Nollet v. Justices of the Trial Court of the Commw. of Mass.,
      83 F. Supp. 2d 204 (D. Mass.), aff'd, 248 F.3d 1127
      (1st Cir. 2000) . . . . . . . . . . . . . . . . . . 50

Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,
      175 F.3d 266 (2d Cir. 1999) . . . . . . . . . . . . 19

Park Slope Jewish Ctr. v. Congregation B'Nai Jacob,
      90 N.Y.2d 517 (1997) . . . . . . . . . . . . . . . . 69

Pennhurst State School & Hospital v. Halderman,
      465 U.S. 89 (1984) . . . . . . . . . . . . . . . 52, 53

Pierson v. Ray,
      386 U.S. 547 (1967) . . . . . . . . . . . . . . . . 47

Plaza Health Laboratories, Inc. v. Perales,
      878 F.2d 577 (2d. Cir. 1989) . . . . . . . . . . . . 19

Polur v. Raffe,
      912 F.2d 52 (2d Cir. 1990), cert. denied,
      499 U.S. 937 (1991) . . . . . . . . . . . . . . . . 51

Presbyterian Church in the United States v. Mary Elizabeth
      Blue Hull Memorial Presbyterian Church,
      393 U.S. 440 (1969) . . . . . . . . . . . . 56, 67, 69

Pulliam v. Allen,
      466 U.S. 522 (1984) . . . . . . . . . . . . . . 48, 49

**Cases**                                                 **Page**

Quern v. Jordan,
440 U.S. 332 (1979) . . . . . . . . . . . . . . . . . 52

Rende and Esposito Consultants, Inc. v. St. Augustine's Roman
Catholic Church,
131 A.D.2d 740 (2d Dep't 1987) . . . . . . . . . . . . 70

Reuters Ltd. v. United Press Int'l, Inc.,
903 F.2d 904 (2d Cir. 1990) . . . . . . . . . . . . . 21

Richards v. State of New York,
597 F. Supp. 692 (E.D.N.Y. 1984), aff'd, 767 F.2d 908
(2d Cir. 1985) . . . . . . . . . . . . . . . . . . . 53

Rodriguez v. DeBuono,
162 F.3d 56 (2d Cir. 1998) . . . . . . . . . . . . 19, 20

Rooker v. Fidelity Trust Co.,
263 U.S. 413 (1923) . . . . . . . . . . . . . . . 34, 47

Saint-Fleur v. City of New York,
No. 99 Civ. 10433 (WHP), 2000 WL 280328
(S.D.N.Y. Mar. 14, 2000) . . . . . . . . . . . . . . 50

Santiago v. New York State Department of Correctional Services,
945 F.2d 25 (2d. Cir.) cert. denied, 502 U.S. 1094,
112 S. Ct. 1168 (1992) . . . . . . . . . . . . . . . 52

Saratoga Water Servs., Inc. v. Saratoga Co. Water Auth.,
190 A.D.2d 40, 596 N.Y.S.2d 872 (App. Div. 1993),
aff'd, 83 N.Y.2d 205, 630 N.E.2d 648, 608 N.Y.S.2d
952 (N.Y. 1994) . . . . . . . . . . . . . . . . 29, 43

Sassower v. Mangano,
927 F. Supp. 113 (E.D.N.Y. 1996) . . . . . . . . . . . 53

Serbian Orthodox Diocese v. Milivojevich,
426 U.S. 696 (1976) . . . . . . . . . . . . . . . . 68

Shapiro v. Cadman Towers, Inc.,
51 F.3d 328 (2d Cir. 1995) . . . . . . . . . . . . . 21

Singh v. Singh,
114 Cal. App. 4th 1264 (2004) . . . . . . . . 68, 72, 77

| Cases | Page |
|-------|------|

Spargo v. New York State Comm'n on Jud. Conduct,
  351 F.3d 65, 75 (2d Cir. 2003), cert. denied,
  ___ U.S. ___, 124 S. Ct. 2812 (2004) . . . . 27, 28, 29, 30,
                                                    31, 33

Sperry Int'l Trade, Inc. v. Gov't of Israel,
  670 F.2d 8 (2d Cir. 1982) . . . . . . . . . . . . . . . 21

Srour v. Bd. of Trustees,
  2004 N.Y. Misc. LEXIS 681 (N.Y. Sup. Ct.,
  June 3, 2004) . . . . . . . . . . . . . . . . . . . 70, 80

St. Matthew Church of Christ Disciples of Christ, Inc. v.
  Creech,
  196 Misc. 2d 843 (N.Y. Sup. Ct. 2003) . . . . . . . 70, 80

Statharos v. New York City Taxi & Limousine Comm'n,
  198 F.3d 317 (2d Cir.1999) . . . . . . . . . . . . 18, 19

Stump v. Sparkman,
  435 U.S. 349 (1978) . . . . . . . . . . . . . . . . . . 47

Sweeney v. Bane,
  996 F.2d 1384 (2d Cir. 1993) . . . . . . . . . . . . . 21

Thaler v. Casella,
  960 F. Supp. 691 (S.D.N.Y. 1997) . . . . . . . . . . . 53

United States v. Lee,
  455 U.S. 252 (1982) . . . . . . . . . . . . . . . . . . 60

Vargas v. City of N.Y.,
  ___ F.3d ___, 2004 U.S. App. LEXIS 15460
  (2d Cir. July 27, 2004) . . . . . . . . . . . 35, 40, 41

Venigalla v. Alagappan,
  763 N.Y.S.2d 765 (2d Dep't 2003) . . . . . . . . . passim

**Cases**                                                                           **Page**

Ward v. Jones,
     154 Misc. 2d 597 (N.Y. Sup. Ct. 1992) . . . . . . . . . 79

Watson v. Christie,
     288 A.D.2d 29 (1st Dep't 2001) . . . . . . . . . . . . . 76

Watson v. Jones,
     80 U.S. 679 (1871) . . . . . . . . . . . . . 64, 65, 66, 72

Women's Comm. Health Ctr. v. Texas Health Facilities Comm'n,
     685 F.2d 974 (5th Cir. 1982) . . . . . . . . . . . . 33, 47

Younger v. Harris,
     401 U.S. 37 (1971) . . . . . . . . . . . . . 2, 26, 27, 31


**Federal Statutes**

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . passim

42 U.S.C. § 1985 . . . . . . . . . . . . . . . . . . 40, 51, 52

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . 49

42 U.S.C. §§ 1981 . . . . . . . . . . . . . . . . . . . . . . . 40

Pub. L. No. 104-317, 119 Stat. 3847, 3853 (1996) . . . . . . 48

**State Constitution and Statutes**

N.Y. Const., art. I, § 3. . . . . . . . . . . . . . . . . . . . 58

Del. Code Ann. tit. 27, §§ 114-115 . . . . . . . . . . . . . 61

Ill. Ann. Stat., ch. 805, para 110/50 . . . . . . . . . . . . 61

Kan. Stat. Ann. §§ 17-1711-13c, 17- 1716a-16c, 17-1732-33,
17-1753-55 . . . . . . . . . . . . . . . . . . . . . . . . 61

La. Rev. Stat. Ann. §§ 12:481-:483 . . . . . . . . . . . . . 61

Mass. Gen. Laws Ann. ch. 67, §§ 39-61 . . . . . . . . . . . 61

Me. Rev. Stat. Ann. tit. 13, § 2982 . . . . . . . . . . . . . 61

Minn. Stat. Ann. §§ 315.15-.17 . . . . . . . . . . . . . . . 61

**State Statutes**                                                   **Page**

N.H. REV. STAT. ANN. § 292:15-:17 . . . . . . . . . . . . . . . 61

N.J. Stat. tit. 16 . . . . . . . . . . . . . . . . . . . . . . 61

N.Y. Const., Art. VI, § 7 . . . . . . . . . . . . . . . . . . 19

N.Y. Jud. Law, § 140 . . . . . . . . . . . . . . . . . . . . 19

Vt. Stat. Ann. tit. 27, §§ 781-944 . . . . . . . . . . . . . 61

Wis. Stat. Ann. §§ 187.01-.19 . . . . . . . . . . . . . . . . 61


FEDERAL RULES

18B Am. Jur. 2d Corporations § 1341 . . . . . . . . . . . . . 82


OTHER AUTHORITIES

Patty Gerstenblith, Associational Structure of Religious
 Organizations, 1995 B.Y.U. L. Rev. 439, 452 (1995) . . . . . 61

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------X
THE HINDU TEMPLE SOCIETY OF NORTH AMERICA,    :
a New York religious corporation; NARENDRA         04 CV 3342
DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; :        (RJD)
HYMA REDDY; DR. PATHMINI PANCHACHARAM;
DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY   :
ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM
DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA     :
MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY
KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH    :
SHANTILAL PANCHAL; RAJ GOPAL IYER,

                                              :

                    Plaintiffs,

                                              :

          - against-

                                              :

THE SUPREME COURT OF THE STATE OF NEW YORK,
ANTHONY J. PIACENTINI, in his official        :
capacity; JOSEPH G. GOLIA, in his official
capacity; SAMBASIVA RAO VENIGALLA;            :
KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA,
NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER,   :
and VASANTRAI M. GANDHI,

                                              :

                    Defendants.
--------------------------------------------X


        **STATE DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
        TO PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION**

                    **Preliminary Statement**

            This memorandum of law is respectfully submitted by the

State of New York, Eliot Spitzer, Attorney General of the State of

New York, on behalf of Defendants The Supreme Court of the State of

New York and the Honorable Joseph G. Golia ("Justice Golia"),

(collectively, the "State Defendants") in opposition to plaintiffs'

application for a preliminary injunction.  Plaintiffs seek to

enjoin the State Defendants from complying with an Order of the New

York State Appellate Division, Second Department by, among other

things, seeking to enjoin the State Defendants from allegedly attempting to impose a membership requirement on the Hindu Temple Society of North America (the "Society"), citing plaintiffs for contempt for failure to comply with Court directives, and continuing any orders allegedly interfering with construction of facilities for the Society. Because this Court should abstain from deciding this matter under <u>Younger v. Harris</u>, and lacks subject matter jurisdiction under the <u>Rooker-Feldman</u> doctrine and the Eleventh Amendment of the U.S. Constitution, Plaintiffs' application should be denied. In addition, plaintiffs' claims must fail because New York's Religious Corporations Law (the "RCL") passes constitutional muster and – though this Court need not reach the merits of this case – so do the State Defendants' actions.

**Statement of the Case**

**The Underlying Facts**

    **A.    The State Proceeding**

    The claims in this case have already been raised and decided in a special proceeding that is currently pending in the Supreme Court for the State of New York, Queens County (Index No. 15676-2001)(hereinafter "the State Proceeding" or "<u>Venigalla</u>")[1].

---

[1] The State Proceeding was originally entitled <u>Sambasiva Rao Venigalla, Kattinger V. Rao, Anand Mohan, Venkaiah Dama, Nehru E. Cherukupalli and Krishnamurthy Aiyer</u> vs. <u>Alagappa Alagappan, Dattatreyyudu Nori, Dr. Gaddam D. Reddy,  Sreedhar Kavil, Jaya</u>
(continued...)

The State Proceeding has been heavily litigated by two factions of a religious corporation formed pursuant to New York State law, which two groups comprise not only the Petitioners and Respondents in the State Proceeding, but also the majority of the parties to this federal action.[2]

The State Proceeding was commenced through the Petition, filed in 2001, by six members of the Society, who are six of the ten defendants herein[3] (hereinafter, "Defendants-State Petitioners"). Defendants-State Petitioners alleged that the Society's Board of Trustees had failed to comply with applicable corporate governance documents through which the Society was formed and established in 1970, and therefore, had failed to comply with New York state law. <u>See</u> Petition; Pl. Ex. 10. Defendants-State

---

[1](...continued)
<u>Sivamurthy, Chitti Ramakrishna Moorthy, Hyma Reddy, Shivakumar K. Prabhat, Uma Myosorekar, Saimamba Veeramachaneni, Vijay Khanna, S. Sundararaman, L.S. Panchal, Raj Gopal, Pathmini Pachacharam, Sekhar Viswanathan, Haresh Sajnani and The Hindu Temple Society of North America</u>. <u>See</u> Petition, dated June 10, 2001 (the "Petition"), submitted to this Court as Plaintiffs' Exhibit ("Pl. Ex.") 10. Mr. Alagappan was later removed as a State Respondent after he resigned from the Society's Board of Trustees. <u>See</u> December 12, 2003 Order, Pl. Ex. 15.

[2] Excepting the State Defendants and Defendant Special Referee Anthony J. Piacentini ("the Referee"), who serves as the court appointed Referee in the State Proceeding, all but six of the parties in the instant case are also litigants in the State Proceeding, which is currently pending before Justice Golia.

[3] The six Defendants-State Petitioners are: Sambasiva Rao, Venigalla Kattinger V. Rao, Anand Mohan, Venkaiah Dama, Nehru E. Cherukupalli, Krishnamurthy Aiyer and Vasantrai M. Gandhi.

Petitioners brought the State Proceeding against eleven of the sixteen Plaintiffs-State Respondents herein,[4] who, except for the Society itself, were members of the Society's Board of Trustees (hereinafter the "Plaintiffs-State Respondents"). Significantly, although the plaintiffs herein repeatedly refer to themselves as "the Temple" and "the Board" throughout their submissions to this Court (see Plaintiff's Memorandum, dated August 5, 2004 ("Pl. Mem.") passim), the Appellate Division has ruled, based on the Society's own corporate governance documents, that the current members of the Board obtained their positions illegally, that the Society's members must elect a new Board, and that the New York Supreme Court must oversee this election. See Venigalla v. Nori, 307 A.D.2d 1041, 763 N.Y.S.2d 765 (2d Dep't 2003), Pl. Ex. 13.

### 1. The Petition In The State Proceeding

In the State Proceeding, Defendants-State Petitioners allege that Plaintiffs-State Respondents improperly denied the Society's members access to books and records regarding the Society's finances, membership and corporate governance documents, and that the existing Board of Trustees improperly acted to perpetuate their control of the Society in contravention of the Society's Articles of Incorporation and original by-laws. See Pl.

---

[4] The eleven Plaintiff-State Respondents are: Dr. Gaddam D. Reddy, Chitti Ramakrishna Moorthy, Hyma Reddy, Shivakumar K. Prabhat, Uma Myosorekar, Vijay Khanna, S. Sundararaman, L.S. Panchal, Raj Gopal, Pathmini Pachacharam and The Hindu Temple Society of North America.

Ex. 10, at pp. 1-14.  The Petition sought an Order removing Plaintiffs-State Respondents from their positions as members of the Board, invalidating the Society's most recent by-laws, appointing a temporary receiver, enjoining the Board from borrowing money or entering into contracts for construction of new facilities for the Society, and compelling an accounting and disclosure of membership lists so that elections might be held by the Society's members for a new Board of Trustees.  <u>Id.</u> at 14-18.  Defendants-State Petitioners alleged that the Society had at one point claimed membership of 14,500 people and receipt of average weekly contributions of $33,604.00, and that the rights of these members were being abrogated by the Plaintiffs-State Respondents' actions. <u>Id.</u> at p. 5.

> ### 2.   The Society's Membership Claims
> ### During Securitization of Millions In Debt

In the 1990's, the Society advertised to the public the sale of bonds in order to finance construction of new facilities. <u>Id.</u>; <u>see also</u> Prospectus for the Sale of $2,650,000 in revenue bonds, dated April 30, 1993, and Prospectus for the Sale of $1,600,000 in general obligation bonds, dated August 20, 1997, attached to the Affirmation of Amy Held, sworn to August 20, 2004, as Exhibits 1 and 2, respectively.  Each Prospectus issued by the Society for the bond sales expressly proclaims that the Society has thousands of members and, separately, hundreds of non-member devotees:

> The Hindu Temple Society of North America today has <u>over eight thousand members</u> from the tri-state area on its rolls.  <u>In addition to these, there are hundreds of non-member devotees</u> who benefit from religious and cultural activities of the Temple

<u>see</u> Held Aff.; Ex. 1 at p. 4 and Ex. 2 at p. 4 (emphasis added).

### 3. <u>Justice Golia's February 14, 2002 Order</u>

Defendant Justice Golia has presided over the State Proceeding and he has issued nine rulings, at least three of which have been separately appealed to the Appellate Division, Second Department, most recently in July of this year.

After undertaking a review of the evidence, the relevant case law and the competing claims and arguments raised by the parties, Justice Golia issued a decision on February 14, 2002, finding that:

a.       The Society is a not-for-profit corporation, specifically, an "incorporated free church," formed pursuant to Article 9 of the Religious Corporation Law.

b.       The Society's Certificate of Incorporation was filed on February 17, 1970, and states that the Society was formed:

> for the purpose of promoting and establishing a place of worship in New York as a permanent place for holding religious and cultural congregations, to conduct religious discourses and instituted meditation centers celebrating religious festivals, conducting religious classes, and facilities for conducting marriage ceremonies;

and

c.    The Society's original by-laws were adopted in 1970 and were amended thirteen times thereafter. <u>See</u> February 14, 2001 Order at pp. 3, 8, and 9-10, Pl. Ex. 11; <u>See also</u> The Society's 1970 By-Laws, Pl. Ex. 7 and The Society's Certificate of Incorporation, Pl. Ex. 6.

In his Order, Justice Golia directed the members and/or Board to amend and adopt new by-laws in conformity with the requirements of the Religious Corporation Law.  <u>See</u> Pl. Ex. 11.  He also denied Defendants-State Petitioners' request to dissolve the Board of Trustees, but required the reduction of the Board to seven Trustees.  <u>Id.</u> at pp. 13-14.  Further, he denied Defendants-State Petitioners' request to require the Board to obtain members' consent and approval for construction projects.  <u>Id.</u> at p. 14.

A judgment was settled, and entered on April 23, 2002. <u>See</u> Judgment, dated April 18, 2002, Pl. Ex. 12.

### 4.    <u>The Appellate Division's August 25, 2003 Decision</u>

Defendants-State Petitioners appealed Justice Golia's decision to the Appellate Division, Second Department.

Notably, Plaintiffs-State Respondents chose not to appeal Justice Golia's decision, and argued that the Second Department should affirm the decision on the grounds that it was within First Amendment parameters, including the court's application of the RCL to the issue of whether the current Trustees of the Board had the right to their offices.  <u>See</u> Appellate Brief of Defendants-State

Petitioners, dated March 5, 2003, pp. 7-9, attached to the Held Aff. as Exhibit 3.

On August 25, 2003, the Appellate Division, Second Department reversed Justice Golia's judgment to the extent appealed from, and found:

a.   The Society had duly adopted by-laws in 1970 and that these by-laws governed the Society;

b.   The by-laws required that proposed amendments thereto be circulated in advance of a meeting of the Society's members, and approval of proposed amendments required a two-thirds vote of the members;

c.   Since adoption of the 1970 by-laws, the Board of Trustees had acted alone to purportedly adopt and amend subsequent by-laws, and there was no evidence in the record that the required procedures were ever followed to amend the 1970 by-laws;

d.   Under the 1970 by-laws, election to the Board required a simple majority of votes from eligible members; and

e.   Since there had been no evidence presented that any of the current Trustees were legally elected to their posts, the current Trustees had acquired no legal right to such offices.

See Venigalla v. Alagappan, 307 A.D.2d 1041, 763 N.Y.S.2d 765 (2d Dep't 2003), Pl. Ex. 13.

Accordingly, the Appellate Division held that the current Trustees should be removed from their offices and it directed Justice Golia to appoint "a referee to direct and oversee a reorganizational meeting of the Society for the purpose of electing a new Board." <u>Id</u>.

### 5. **Justice Golia's October 23, 2003 Order**

On October 23, 2003, Justice Golia appointed the Referee in accordance with the Appellate Division's Order. <u>See</u> October 23, 2003 Order, Pl. Ex. 14.

### 6. **Justice Golia's December 12, 2003 Order**

Following the Appellate Division's decision, Defendants-State Petitioners' brought an order to show cause to compel the Defendants-State Respondents to turn over custody of all financial, legal and other documents to their counsel for safe keeping, and to direct Plaintiffs-State Respondents not to enter into any long term or extended contracts of agreements without the consent of the Referee.

On November 7, 2003, Plaintiffs-State Respondents filed a cross-motion in which they sought to have "the Court, rather than the Referee, to determine the definition of 'voting member' for purposes of the ordered election." <u>See</u> Notice of Cross-Motion for Determination of Voting Membership, dated November 7, 2003, signed by Burke & Stone LLP, counsel for Plaintiffs-State Respondents in the State Proceeding, attached as Exhibit 4 to the Held Aff.

-9-

Significantly, in support of their application, Plaintiffs-State Respondents submitted an affirmation of their counsel, which stated Plaintiff-State Respondents' position that the Court should determine criteria for the Society's voting membership. <u>See</u> Affirmation of William J. Burke, Esq., pp. 1-2 at pars. 2 and 4 (stating that the court should make the threshold determinations that must be made before the referee can supervise an election, and that "[t]he most obvious one is eligibility criteria for voting membership under the '1970 bylaws'"), attached as Exhibit 5 to the Held Aff.

On December 12, 2003, Justice Golia granted Defendants-State Petitioners' order to show cause to compel the Defendants-State Respondents to turn over custody of all financial, legal and other documents to their counsel for safe keeping, and to direct Plaintiffs-State Respondents not to enter into any long term or extended contracts of agreements without the consent of the Referee. <u>See</u> December 12, 2003 Order, Pl. Ex. 15. Justice Golia also denied Plaintiffs-State Respondents' cross-motion and ordered Referee Piacentini to make a determination of what constitutes a voting member of the Society for purposes of overseeing the members' election of the new Board. <u>Id</u>.

### 7. Plaintiffs-State Respondents' <u>December 18, 2003 Letter</u>

On December 18, 2003, Plaintiffs-State Respondents submitted a letter to the Referee that purported to identify 107

voting members of the Society, based on a membership criteria that included "governance" of the Society. A copy of the letter is attached hereto as Exhibit 6 to the Held Aff. In addition, the letter refers to Plaintiffs-State Respondents' prior proposal of an electorate of forty members, which would be comprised of the current Board of Trustees, the current Executive Committee who are not Trustees, and current Youth members "holding comparable positions." <u>Id</u>.

## 8. **The Referee's January 6, 2004 Interim Report**

To comply with Justice Golia's limited directive to oversee an election of a new Board by the Society's members, the Referee, among other things, held a meeting with approximately 185 Society members and examined the Society's existing books and records to determine membership for an election of the Board, and, on January 6, 2004, issued an Interim Report containing his findings. <u>See</u> Interim Report, Pl. Ex. 16. In the Report, the Referee stated that he had examined financial statements and documents, as well as the newsletters published by the Society, and concluded:

> there is no objective record or procedure which had been adopted or promulgated by the Society, in a clear and distinct manner, which would enable me, as Referee, to determine from existing books and records, who are members of the Society, or for that matter, how or when and for what reason they became lifetime members or general members.

<u>Id.</u> at p. 2. He then proceeded to determine a neutral procedure derived from the 1970 by-laws for the limited purpose of identifying the voting members of the Society. <u>Id.</u> at pp. 2-3.

Since the by-laws provided that applicants for membership are to be approved by a Managing Committee, the Referee convened a Managing Committee to determine who among the 15,000 to 21,000 persons identified on the Society's membership list would be voting members. <u>Id.</u> at 3; <u>see also</u> By-Laws, Pl. Ex. 7 at Articles IV, V and VI. The Managing Committee was made up of three representatives of the State Proceeding Petitioners and three members of the State Proceeding Respondents, with himself as Referee to cast any necessary tie breaking vote. Pl. Ex. 16 at p. 3.

In response, Plaintiffs-State Respondents filed a motion on January 23, 2004 to reject the Referee's Interim Report and to stay all proceedings before the Referee, arguing that the First Amendment barred the Referee's proposed plan to identify voting members. <u>See</u> Pl. Mem. at p. 14; <u>see</u> <u>also</u> Plaintiffs-State Respondents' Notice of Motion, dated January 23, 2005; Moving Affirmation of William J. Burke, dated January 23, 2004; Reply Affidavit of Uma Mysorekar, dated April 19, 2004; Reply Affirmation of William J. Burke, dated April 19, 2004; and Pl. Reply Mem., dated April 19, 2004, attached to the Held Aff. Within Ex. 7 as Exs. N, O, Q, R, and S, respectively.

On February 5, 2004, the Referee submitted a response to Plaintiffs-State Respondents' moving papers explaining how his actions fit within his mandate to oversee the Society's members' election of a new Board.  See Response, Pl. Ex. 17.  Since the Society had never followed its by-laws and there were no identifiable voting members, the Referee had determined that in order to identify the Society's voting members, those on the Society's mailing lists should be contacted for the purpose of determining the Society's voting membership.  Id. at p. 5.  He further noted:

> It is my intent to have the Managing Committee, which is to be comprised of three members from the existing Board of Trustees and three Petitioners, draft an application for membership which must strictly conform to the By-Laws.  The only direct input I would have on the issue of someone becoming a voting member, is to cast a tie-breaking vote for someone who has met the requirements proscribed by the By-Laws, if the Committee cannot agree. I do not agree with the Respondents position that this in effect means that I have entered into the membership determination process.  I must remind the attorney for the Respondents that I may never cast a tie-breaking vote if the Managing Committee fulfills its responsibility to act in good faith in voting membership.  If the Respondents or the Petitioners choose to be at odds with one another in carrying out their duties as the Managing Committee, then no one will become a voting member.  If this were to occur, then the Orders of the Appellate Decision and of this Court could never be implemented, and the Society would continue along without voting members and with an unelected Board of Trustees, in violation of the Religious Corporation Law of the State of New York.

Id. at pp. 2-3.

### 9. **Justice Golia's April 7, 2004 Order**

On April 7, 2004, Justice Golia issued an Order denying Plaintiffs-State Respondents' motion for the Pro Hac Vice admission of Roman P. Storzer of the Becket Fund, as special counsel.  See Order, Pl. Ex. 18.  However, Justice Golia expressly stated that he would accept any Amicus Brief filed by the Becket Fund or any other group or organization in the State Proceeding.  Id.  He further stated he found no "violation of the First Amendment or entanglement of any kind" in the Referee's actions taken to oversee the election of a new Board by the Society's members.  Id.

### 10. **Justice Golia's May 18, 2004 Order**

On May 18, 2004, Justice Golia denied Plaintiffs-State Respondents' order to show cause to stay the State Proceeding pending resolution of their motion to reject the Referee's Interim Report.  See Order, Pl. Ex. 20; see also Held Aff., Ex. 7 at Ex. E therein.  In support of their application, Plaintiffs-State Respondents submitted two emergency affirmations that alleged imminent irreparable harm would occur to their constitutional rights if the stay were to be denied.  See Affirmations of Joseph A. Baum, dated May 17, 2004, attached to the Held Aff. Within  Ex. 7 as Exs. F and G, respectively.

### 11. **The Appellate Division Refused To Stay The Proceedings Before The Referee**

On April 19, 2004, Plaintiffs-State Respondents sought from the Appellate Division a stay of the proceedings before the

Referee pending Justice Golia's decision on their motion to reject the Referee's Report. See CPLR 5704(a) Application, dated May 21, 2004 and Notice of Application, dated May 21, 2004, attached to the Held Aff. Within Ex. 7 as Exs. A and B, respectively. In support of their application, Plaintiffs-State Respondents submitted all of their supporting papers on the motion in the lower court (see Exs. A through U within Ex. 7 to the Held Aff.) and argued, as they had before Justice Golia, that their First Amendment rights would be irreparably injured absent a stay. Id., see also Pl. Moving Mem., dated April 19, 2004, attached to Held Aff. as Ex. 8.

Four Justices of the Appellate Division concurred in denying the application. See Order, dated May 24, 2004, attached to the Held Aff. as Ex. 9.

### 12. **Justice Golia's June 10, 2004 Order**

On June 10, 2004, Justice Golia denied Plaintiffs-State Respondents' April 21, 2004 motion to reject the Referee's Report and stay all proceedings before the Referee. See Order, dated June 10, 2004, Pl. Ex. 21. In so doing, he noted that:

> the present Board was illegitimate, and in place only as a "caretaker" regime until a new board can be elected by the voting members. Unfortunately, there seems to be no list of voting members due to the extreme hubris of the existing board who have asserted that there are no members who are entitled to vote. Indeed according to the current Board there are no members at all, only individual contributors who have attained the appellation of "devotee".

Id. at pp. 1-2.

In his Order, he also denied Defendants-State Petitioners' motion to remove the Society's sitting Board. <u>Id</u>.

### 13. <u>Justice Golia's July 7, 2004 Order</u>

On June 26, 2004, Plaintiffs-State Respondents filed a motion to disqualify the Referee, alleging that he had appeared to hold an <u>ex parte</u> meeting with petitioners.

After reviewing all evidence, the relevant case law and the competing claims and arguments raised by the parties, Justice Golia denied the motion on July 7, 2004. <u>See</u> July 7, 2004 Order, Pl. Ex. 22. In so doing, Justice Golia noted that in spite of his invitation, he had never received any briefs from the Becket Fund, and that Plaintiffs-State Respondents' motion papers contained misrepresentations that would be addressed, if need be, in the event sanctions were later imposed. <u>Id.</u> at 2.

### 14. <u>Justice Golia's July 13, 2004 Order</u>

On July 13, 2004, Justice Golia signed an order to show cause sought by Defendants-State Respondents, directing Plaintiffs-State Respondents to show cause why they should not be held in contempt for failure to comply with the Referee's directions and with the Court's June 10, 2004 Order, and setting a hearing date for August 18, 2004. <u>See</u> Order, Pl. Ex. 25.

### 15. <u>The Appellate Division Refused to Stay the June 10, 2004 Decision and Order</u>

On June 23, 2004, Plaintiffs-State Respondents filed with the Appellate Division, Second Department, a Notice of Appeal of

the June 10, 2004 Order denying their motion to reject the Referee's report and stay all proceedings before him.  A copy of the Notice of Appeal, dated June 23, 2004, is attached to the Held Aff. as Exhibit 10.

On June 30, 2004, plaintiffs sought a stay of Justice Golia's June 10, 2004 Order in the New York State Appellate Division, Second Department by Order to Show Cause, pending their appeal.  See Order to Show Cause, dated June 30, 2004, attached to the Held Aff. as Ex. 11.  Plaintiffs argued that a stay was necessary to prevent violation of their First Amendment rights to religious freedom.  See Moving Affirmation of William J. Burke, Esq., dated June 28, 2004, pars. 2, 9-15, 22-23, 26, 39-43, attached without exhibits to the Held Aff. as Ex. 11; see also "Description of Appeal" section on page 2 of Form A - Request for Appellate Division Intervention, dated June 25, 2004, attached to the Held Aff. as Ex. 12.  Plaintiffs-State Respondents filed a copy of the April 19, 2004 brief in support of their application.  See Held Aff., Ex. 8.

The Appellate Division did not find Plaintiffs-State Respondents' claims convincing.  On July 23, 2004, the Appellate Division denied the request for a stay.  See Order, Pl. Ex. 26.

**B.**   **Plaintiffs File The Instant Federal Action**

On August 4, 2004, Plaintiffs-State Respondents, in conjunction with six other individuals named as plaintiffs, filed

-17-

an application with the United State District Court, Eastern District of New York for a preliminary injunction. This Court made the matter returnable on August 17, 2004 at noon, with affidavits and memoranda of law in opposition to the request for a preliminary injunction due to be filed by 11:00 am on August 16, 2004. <u>See</u> Notice of Motion, dated August 4, 2004, attached to the Held Aff. as Ex. 13. By teleconference on August 12, 2004, these dates were adjourned to August 24, 2004 at 10:00 a.m. and August 20, 2004 at 5:00 p.m., respectively. <u>See</u> Held Aff., p. 5 at par. 16.

<u>**ARGUMENT**</u>

### PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED

A preliminary injunction is a drastic remedy which should be granted only in extraordinary circumstances. Because plaintiffs have failed to meet the minimum prerequisites for a preliminary injunction, their application for this extraordinary relief should be denied.

In this Circuit, a party seeking a preliminary injunction must establish that: "1) absent injunctive relief, it will suffer irreparable harm, and 2) either a) that it is likely to succeed on the merits, or b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." <u>Statharos v. New York City Taxi & Limousine Comm'n</u>, 198

F.3d 317, 321 (2d Cir. 1999) (quoting Otokoyama Co. Ltd. v. Wine of Japan Import, Inc., 175 F.3d 266, 270 (2d Cir. 1999)); Rodriguez v. DeBuono, 162 F.3d 56, 60 (2d Cir. 1998); Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 579-80 (2d. Cir. 1989).  However, when a party seeks an injunction "to prevent government action taken pursuant to statutory authority, which is presumed to be in the public interest, only the likelihood of success standard applies."  Statharos, 198 F.3d at 321  (quoting Molloy v. Metro. Transp. Auth., 94 F.3d 808, 811 (2d Cir. 1996)).  See also Perales, 878 F.2d at 580 (where "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim"); Rodriguez, 162 F.3d at 60.

Here, plaintiffs are seeking, among other things, to enjoin the enforcement of certain orders preserving the status quo regarding construction of Society facilities that were entered by the Supreme Court of the State of New York, Queens County (Golia, J.) pursuant to its constitutional and statutory authority as part of the judicial branch of the State of New York.  See N.Y. Const., Art. VI, § 7; N.Y. Jud. Law, § 140-b.  Plaintiffs are also seeking to enjoin the State Defendants from issuing and enforcing orders

implementing the Appellate Division's directive - which was issued upon a determination that the Society's existing Trustees have "no legal right to such offices" pursuant to the Society's own corporate governance documents - that a court appointed referee should direct and oversee a reorganizational meeting of the Society for purposes of electing a new Board. See Venigalla, 307 A.D.2d 1042-43, 763 N.Y.S.2d 765. These orders sought to be enjoined include any rulings regarding membership requirements of the Society, directing any mailings to the Society's mailing lists, and citing plaintiffs for contempt for failure to comply therewith. Therefore, to prevail on an application for a preliminary injunction, plaintiffs must demonstrate both irreparable injury and a likelihood of success on the merits of their claims against Justice Golia and the other State Defendant in this action. Because plaintiffs cannot do so, their application should be denied.

## I. <u>Plaintiffs Have Not Demonstrated Irreparable Injury</u>

The United States Court of Appeals for the Second Circuit has held that irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction.'" <u>Rodriguez v. DeBuono</u>, 162 F.3d. at 61 (quoting <u>Bell & Howell: Mamiya Co. v. Masel Supply Co.</u>, 719 F.2d 42, 45 (2d Cir. 1983)). Accordingly, "the moving party must first demonstrate that such [irreparable] injury is likely before the other requirements for

the issuance of an injunction will be considered." Id. (quoting Reuters Ltd. v. United Press Int' l, Inc., 903 F.2d 904, 907 (2d Cir. 1990)). "The movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages." Id. (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)). See also Sweeney v. Bane, 996 F.2d 1384, 1387 (2d Cir. 1993) (upholding denial of preliminary injunction seeking to prevent erroneous Medicaid co-payments because harm was purely financial); Sperry Int'l Trade, Inc. v. Gov't of Israel, 670 F.2d 8, 12 (2d Cir. 1982).

Plaintiffs' argument that they are in danger of losing their First Amendment freedoms (see Pl. Mem. at pp. 1-61) is without merit. In fact, Plaintiffs-State Respondents have unsuccessfully made these First Amendment arguments to two state courts.

In its July 23, 2004, decision denying the stay that Plaintiffs-State Respondents sought of Justice Golia's June 10, 2004 Order, the Appellate Division, Second Department was faced with the same argument as this Court, to wit, that the orders of Justice Golia and the Referee were impinging on Plaintiffs-State Respondents' constitutional rights. See Pl. Mem. at p. 15; see also Held Aff., Exs. 11 and 12; see also Pl. Appellate Mem., filed June 30, 2004, attached to the Held Aff. as Ex. 8, at pp. 1-39. In

denying the stay, the Appellate Division rejected Plaintiff's arguments and claims of immediate irreparable harm. See Order Denying Stay, dated July 23, 2004, Pl. Ex. 26.

While the Appellate Division's determination as to irreparable injury is limited in time period, the very fact that it made this determination fatally undercuts plaintiffs' claims that if the Referee proceeds to oversee an election of the Board by the members of the Society, plaintiffs will be irreparably harmed.

Likewise, in his May 18, 2004 Order, Justice Golia rejected Plaintiffs-State Respondents' claims of immediate injury when he denied their order to show cause which sought a stay of all proceedings pending their motion to reject the Referee's Interim Report. Pl. Ex. 20.

Moreover, four justices of the Appellate Division issued the May 24, 2004 Order denying plaintiffs' application for a stay of the proceedings before the Referee during the pendency of their motion to reject the Referee's Report. See Held Aff., Ex. 9. In so doing, they rejected the same First Amendment arguments, and claims of irreparable injury, that plaintiffs make here. See Held Aff., Exs. 7 and 8.

In addition, plaintiffs' argument rings hollow that, without violating the First Amendment, the Referee – as a "non-Hindu" and "non-believer" (see Pl. Ex. Ex. 3, at par. 6; Pl. Ex. 2 at par. 14)– cannot be involved in the process of resolving

disputes between the members of the Managing Committees over issues such as whether membership application forms may be mailed to persons on the Society's mailing lists, whether edits to the Society's membership application forms should be made to conform to the Society's by-law requirements, or whether any application forms returned by those on the Society's mailing lists comply with the stated membership requirements of the Society's bylaws. <u>See</u>, <u>e.g.</u>, Pl. Exs. 16 and 17. Plaintiffs' contention of harm from an outsider making these determinations is belied by their own prior motion before Justice Golia to seek to have the Court "determine the definition of 'voting member' for purposes of the ordered election, as well as all other necessary threshold determinations."[5] <u>See</u> Held Aff., Exs. 4 and 5. If plaintiffs truly believed harm would result from a non-Hindu/outsider determining the voting membership of the Society now, they would not have earlier asked Justice Golia to make the very same membership decisions. <u>Id</u>.

For several additional reasons, plaintiffs' credibility is suspect in claiming any harm from the State Defendants' attempt to implement the Appellate Division's directive to oversee an election of the new Board on the purported grounds that the Society

---

[5]Indeed, at the time of their motion, Plaintiffs-State Respondents had already urged the Appellate Division to affirm Justice Golia' April 18, 2002 Judgment, arguing it was within the parameters of the First Amendment. <u>See</u> Held Aff., Ex. 3.

conceives of itself as having no members – only devotees – because the Society does not have "even a concept of membership." See Pl. Mem. at p. 36; p. Pl. Mem. at pp. 32, 35 and 37; see also Affirmation of Uma Myosorekar, Pl. Ex. 1 at pp. 2-3, at pars. 2-7. First, plaintiffs' contention that there are and should be no members of the Society is squarely controverted by the 1970 by-laws, which provide for the Society's members to elect the Board of Trustees, and which the Appellate Division held were duly adopted in 1970 and must be complied with to elect a new Board of Trustees. See Pl. Exs. 7 and 13.

Second, plaintiffs' present position that there are no voting members of the Society is contradicted by their own submissions to the Referee in the State Proceedings in which they urged him to rule at one point that the Society had forty voting members, and at another point, 107 voting members, based on a "governance" criteria. See Held Ex. 6. If Plaintiffs-State Respondents are currently governing the Society as members of the Board, and they have asked the Referee to adopt two proposed definitions of the Society's membership that included a "governance" criteria fulfilled by said members' participation in management of the Society, then is it not likely that said members' interests were aligned with the existing Board, and therefore, with Plaintiffs-State Respondents? If this is so, then, if either of plaintiffs' proposed definitions of the Society's voting members

were accepted by the Referee, it would result in a group of members that would likely re-elect the existing Board. Notably, when urging the Referee to determine the Society's voting members in this manner, Plaintiffs-State Respondents raised no objections to the concept of "membership" as a "wholly foreign, Western idea that the Defendants have attempted to impose upon [the Society]" that is inconsistent with Hinduism. (See Pl. Mem. at p. 32).

Third, plaintiffs' present position that membership is a foreign concept and that members are more properly considered to be devotees of the Society is flatly contradicted by the Prospectuses that were distributed to the public in connection with the Society's efforts to raise money through bonds in the 1990's. In those Prospectus', the Society claims to have "over eight thousand members," as distinct from "hundreds of devotees." Id. At the time these Prospectus were issued to the public, according to Plaintiffs-State Respondents (see Pl. Ex. 2 at pars. 2-4), it appears that they were controlling the Society, so it is reasonable to view the Prospectuses as admissions on their behalf. It is beyond dispute that these admissions of membership are binding on the plaintiff Society.

Accordingly, it is clear from the above, that what has been said about the Society's membership, by the Society itself and by Plaintiffs-State Respondents, has been inconsistent. This must adversely affect plaintiffs' credibility in its claims of imminent

harm from the State Defendants' efforts to implement the Appellate Division's directive to oversee an election of a new Board for the Society.

Finally, the inclusion by Plaintiffs-State Respondents of six additional individuals as named plaintiffs appears to be nothing more that a thinly disguised attempt to avoid the automatic bars to suit posed by the doctrines of <u>Younger</u> abstention, <u>Rooker-Feldman</u>, and collateral estoppel, and should not be countenanced. <u>See</u> Sections II, A and II, B <u>infra</u> at pp. 27-47. For this reason alone, any alleged irreparable injury on their behalf should be disregarded. In any event, to the extent these six individuals claim any harm, those claims must fail for the same reasons set forth above, because their purported injury is identical to that of the Plaintiffs-State Respondents by virtue of their association with the Society. Accordingly, plaintiff Desai's claims of injury in his capacity as a devotee cannot support injunctive relief. Moreover, because the other five individuals who have been included as plaintiffs have proffered no evidence of harm, no relief should issue on their behalf.

Because plaintiffs cannot demonstrate irreparable harm, their application for a preliminary injunction should be denied.

## II. Plaintiffs Cannot Demonstrate A Likelihood of Success on the Merits

Plaintiffs' application should also be denied because they cannot demonstrate a likelihood of success on the merits of

their claim. Plaintiffs' claims are defective and barred by the doctrine of abstention announced in <u>Younger v. Harris</u>, the <u>Rooker-Feldman</u> doctrine, and the Eleventh Amendment to the United States Constitution. Likewise, plaintiffs' facial challenge to the constitutionality of the RCL is fatally flawed. In any event, though this Court need not reach a decision on the merits, plaintiffs' claims must fail because defendants' actions are permissible under the U.S. Constitution.

### A. Plaintiffs' Claims Are Barred By <u>Younger</u> Abstention

Pursuant to <u>Younger v. Harris</u>, 401 U.S. 37 (1971), this Court should abstain from considering plaintiffs' claims in the present action, which challenge the facial and "as applied" constitutionality of New York's RCL.

Grounded upon principles of federalism and comity, <u>Younger</u> abstention "rests foursquare on the notion" that a state proceeding constitutes a sufficient forum for the vindication of federal constitutional rights. <u>Diamond "D" Constr. Corp. v. McGowan</u>, 282 F.3d 191, 198 (2d Cir. 2002); <u>see also</u> <u>Spargo v. New York State Comm'n on Jud. Conduct</u>, 351 F.3d 65, 75 (2d Cir. 2003) ("<u>Younger</u> generally prohibits courts from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings so as to avoid unnecessary friction.") (internal quotations omitted), <u>cert. denied</u>, ___ U.S. ___, 124 S. Ct. 2812 (2004). Thus, under <u>Younger</u>, a federal court must refrain

from exercising jurisdiction where: (1) there is an ongoing state court proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of federal constitutional claims. Spargo, 351 F.3d at 75. "[W]hen Younger applies, abstention is mandatory and its application deprives the federal court of jurisdiction in the matter." Diamond "D", 282 F.3d at 197.

All three Younger factors are satisfied here. First, it is beyond cavil that there is an ongoing state court "special proceeding," now captioned Venigalla v. Nori, Queens County Supreme Court Index No. 15676/2001. Indeed, plaintiffs in the present federal action seek to enjoin Venigalla, having named the judge presiding over that proceeding, Justice Golia, as well as the court-appointed Referee, as defendants here in alleging that "the state judicial process" is violating the "constitutionally protected autonomy of the Hindu Temple Society through an unconstitutional application of the New York Religious Corporations Law" (Pl. Mem. 3; see also Pl. Mem. at p. 41 ["Defendants have also conspired to deprive the Temple of its free exercise rights through skewed application of the RCL"]; at p. 43 ["Defendants Golia and Piacentini justify all of their interference with Temple governance and religious exercise . . . on the basis of the Appellate Division's 200[3] decision."])).

Second, that ongoing state proceeding implicates an important state interest. "[T]he State's interests in protecting members of religious corporations . . . are compelling ones." Greek Orthodox Archdiocese of N. & S. Am. v. Abrams, 162 Misc. 2d 850, 859, 618 N.Y.S.2d 504 (N.Y. Sup. Ct. N.Y. Co. 1994) (citing Larson v. Valente, 456 U.S. 228, 248 (1982)).

Third, Venigalla affords the plaintiffs an adequate opportunity for judicial review of any constitutional challenge to the provisions of the RCL. See, e.g., Friedman v. Cuomo, 39 N.Y.2d 81, 83, 346 N.E.2d 799, 382 N.Y.S.2d 961 (N.Y. 1976) (upholding constitutionality of N.Y. Election Law provisions challenged in special proceeding); Saratoga Water Servs., Inc. v. Saratoga Co. Water Auth., 190 A.D.2d 40, 596 N.Y.S.2d 872 (App. Div. 1993) (same, as to N.Y. Public Authorities Law provision), aff'd, 83 N.Y.2d 205, 630 N.E.2d 648, 608 N.Y.S.2d 952 (N.Y. 1994). The fact that the plaintiffs failed to obtain leave to appeal from the Appellate Division's August 2003 decision – which held that provisions of the RCL control the internal governance structures of the Hindu Temple – to the New York Court of Appeals and, if necessary, the United States Supreme Court does not make those avenues of redress any less "adequate" for Younger purposes. See Spargo, 351 F.3d at 79 (holding that plaintiffs must avail themselves of potential appeal to New York Court of Appeals rather than have the federal courts "tak[e] jurisdiction over the same

claims while the state proceeding is pending"). Moreover, because the State Proceeding has yet to conclude, the plaintiffs will have another opportunity to obtain appellate review of the decisions and actions of Justice Golia and the Referee. Particularly since "[t]he relevant question under <u>Younger</u> is [only] whether the state's procedural remedies <u>could</u> provide the relief sought[,] not whether the state <u>will</u> provide the constitutional ruling that the plaintiff seeks," <u>Spargo</u>, 351 F.3d at 79 (internal quotations and emendations omitted) (emphasis in original), this Court must abstain here.

That six of the fifteen individual plaintiffs in the federal action are not parties to <u>Venigalla</u>[6] does not alter that conclusion. <u>Younger</u> "permit[s] state courts to try state cases free from interference by federal courts, particularly where the part[ies] to the federal case may fully litigate [their] claim[s]

---

[6]    In their brief filed here in support of their preliminary injunction motion, the plaintiffs acknowledge that "nine of the fifteen plaintiffs in this action are parties to" <u>Venigalla</u> (Pl. Mem. at p. 3 n.1).  The nine individuals are Hyma Reddy, Pathmini Panchacharam, Uma Mysorekar, Gaddam D. Reddy, Chitti Ramakrisha Moorthy, Shivakumar K. Prabhat, Vijay Khanna, Subaramaniam Sundararaman, and Lakshesh S. Panchal.   (<u>Compare</u> caption of plaintiffs' federal complaint <u>with</u> Pl. Ex. 10). The six plaintiffs who are not parties to <u>Venigalla</u> are Narendra Desai, Mathy Pillai, Nirmala Ramasubramanian, Brahman S. Pillai, Krishnaswamy Anandaram, and Raj Gopal Iyer.  Note, however, that in the body of their complaint, the plaintiffs: (1) omit any mention of Nirmala Ramasubramanian, who is listed as a plaintiff in the caption of the federal action (<u>see</u> Compl. ¶¶ 9-23); and (2) incorrectly identify two other plaintiffs, Hyma Reddy and Pathmini Pancharam, as not having been parties to <u>Venigalla</u>, when in fact they are (<u>compare</u> Compl. ¶¶ 11-12 <u>with</u> Pl. Ex. 10).

before the state court." Hicks v. Miranda, 422 U.S. 332, 349 (1975) (citation and internal quotations omitted).

In Hicks, the Supreme Court abstained from adjudicating the claims of individuals who, while not themselves parties to the ongoing state court proceedings, brought before a federal court an issue that already was under consideration by a state court. Because the interests of the federal and state court litigants "were intertwined," id. at 348, the Supreme Court held that "the requirements of Younger v. Harris could not be avoided." Id. at 349. "[T]he same comity considerations [identified in Younger] apply, where the interference is sought by some . . . not party to the state case." Id.; see also Doran v. Salem Inn, Inc., 422 U.S. 922, 928-29 (1975) (multiple parties may be "so closely related" as to be "subject to the Younger considerations which govern any one of them"); Spargo, 351 F.3d at 82, (noting that "Younger may apply to the claims of third-parties who are not directly involved in any pending state proceeding," and applying Younger where legal analysis of federal plaintiffs' claims was "unavoidably intertwined and inseparable from" analysis of a different but related plaintiff's claims in ongoing state proceeding).

Like the Hicks plaintiffs, the interests of the six individual plaintiffs not parties to Venigalla are indistinguishable from the interests of the nine other individual plaintiffs who are parties to that proceeding. See Compl. ¶¶ 9-23;

Pl. Ex. 10; see also supra note 6.  Although four of the six plaintiffs simply are "devotees" to the Society whereas the nine others generally play a larger role in the Society's internal governance, every federal plaintiff without exception seeks to set aside: (1) the Appellate Division's August 2003 decision, which held that the Society must adhere to the provisions of the RCL and other statutory provisions of New York law; and (2) the subsequent orders of Justice Golia and actions of the Referee that sought to enforce the Appellate Division's decision.  Moreover, the inextricable interconnectedness between the present federal action and Venigalla is highlighted by the fact that two plaintiffs (Hyma Reddy and Pathmini Panchararam) who are parties to the ongoing State Proceeding are members of the Society's Executive Committee, Compl. ¶¶ 11-12; Pl. Ex. at p. 10; see also supra note 6, whereas two other plaintiffs (Narenda Desai and Krishnaswamy Anandaram) who also are members of that Executive Committee are not parties to Venigalla.  Desai and Anandaram therefore cannot claim not to have been aggrieved by the Appellate Division's August 2003 decision, Justice Golia's subsequent orders, and the Referee's subsequent actions, or that they have lacked notice of, or an opportunity to participate in, the ongoing Venigalla proceeding.

Allowing the six individual plaintiffs not party to Venigalla to proceed in a federal forum simply because they could have, but opted not to, intervene in the State Proceeding would

-32-

turn Younger's logic on its head. The nine individual plaintiffs party to Venigalla would be proscribed under Younger from challenging the RCL, but the six other individual plaintiffs who are adherents of the Society – persons whose interests are incontestably and inextricably intertwined with those of their nine co-plaintiffs – could seek precisely the same relief in federal court despite the pendency of the Venigalla proceeding. It is exactly to prevent such a result that at least one federal court of appeals expressly has held that "Younger cannot be avoided simply by joining nonparties to the state court proceeding in order to procure injunctive and declaratory relief [in federal court] against that proceeding." Women's Comm. Health Ctr. v. Texas Health Facilities Comm'n, 685 F.2d 974, 982 (5th Cir. 1982) (citing Hicks, 422 U.S. 332).

Finally, plaintiffs nowhere allege that the ongoing State Proceeding was brought in "bad faith" or that any "unusual circumstance" warrants the exercise of federal jurisdiction in spite of Younger's applicability. See Spargo, 351 F.3d at 75 n.11 (refusing to consider exceptions to Younger where plaintiffs failed to allege any). To be sure, neither plaintiffs' apparent dissatisfaction with the Appellate Division's August 2003 decision nor their failure to obtain leave to appeal that decision to the New York Court of Appeals provides any basis for holding Younger inapplicable. See Diamond "D", 282 F.3d at 199 ("A state

-33-

proceeding that is legitimate in its purposes, but unconstitutional in its execution – even when the violations of constitutional rights are egregious – will not warrant the application of the bad faith exception."); id. at 201-202 ("extraordinary circumstances" exception to Younger inapplicable where plaintiff has state remedy to "meaningfully, timely, and adequately remedy the alleged constitutional violation").

    **B.   The Rooker Feldman Doctrine Bars This Court From Exercising Jurisdiction Over Virtually All Of Plaintiffs' Claims**

        Even if plaintiffs somehow were able to avert the Younger bar, the Rooker-Feldman doctrine precludes this Court from addressing the merits of the vast majority of their constitutional claims. Apart from their muted facial challenge to the constitutionality of the RCL – to which plaintiffs devote a scant two pages of their 61-page memorandum of law in support of their motion for a preliminary injunction (see Pl. Mem. at pp. 59-61) – the Rooker-Feldman doctrine bars consideration by any lower federal court of any of plaintiffs' claims that essentially challenge the New York State courts' previous application of the provisions of the RCL to plaintiffs.

        The Rooker-Feldman doctrine – which takes its name from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983) – prohibits any federal court but the Supreme Court

itself from exercising subject matter jurisdiction over a suit that seeks either direct review of a judgment of the state court, or resolution of an issue that is "inextricably intertwined" with an earlier state court determination. See Feldman, 460 U.S. at 476; Vargas v. City of N.Y., ___ F.3d ___, 2004 U.S. App. LEXIS 15460, at *9 (2d Cir. July 27, 2004). The lower federal courts have subject matter jurisdiction over general challenges to statutes, like the RCL, that are promulgated pursuant to a non-judicial legislative process. Feldman, 460 U.S. at 486. But they lack subject matter jurisdiction over challenges to "state-court decisions in particular cases arising out of judicial proceedings," even where, as here, such challenge alleges that the state court's action was unconstitutional. Id. Review of those state court decisions "may be had only in" the Supreme Court. Id.

### 1. Plaintiffs' Direct Attack on Prior State Court Orders and Judgments

Rooker-Feldman applies here because any of plaintiffs' claims that relate to their "as applied" challenge to the constitutionality of the RCL constitute a direct attack on prior orders and judgments of the state courts in Venigalla, a litigation that remains ongoing. But because Rooker-Feldman's applicability turns on the orders and judgments rendered to date in Venigalla, a brief synopsis of those proceedings is necessary.

In June 2001, Sambasiva Rao Venigalla, Kattinger V. Rao, Anand Mohan, Venkaiah Dama, Nehru E. Cherukupalli, and

-35-

Krishnamurthy Aiyer (identified collectively, "Defendants-State Petitioners") – all of whom are defendants in the present federal case – commenced a special proceeding in Queens County Supreme Court (Golia, J.) against, <u>inter</u> <u>alia</u>, the Society and nine persons (collectively, with the Society, "Plaintiffs-State Respondents") who are plaintiffs here. <u>See</u> <u>supra</u> note 6. Defendants-State Petitioners alleged that in a variety of ways, the Society's means of self-governance failed to comply with New York law, including provisions of the RCL. Justice Golia granted the Petition in part and denied it in part in a decision dated February 14, 2002, and judgment was entered in Queens County Supreme Court in April 2002. <u>See</u> Pl. Exs. 11-12.

Defendants-State Petitioners appealed to the Appellate Division, Second Department, and in August 2003, that court reversed that portion of the judgment that denied the petition in part, and remitted the matter to Queens County Supreme Court "for the appointment of a referee" to "oversee a reorganization meeting" of the Society "for the purpose of electing a new Board" of Trustees. <u>Venigalla v. Alagappan</u>, 307 A.D.2d 1041, 1041, 1043, 763 N.Y.S.2d 765 (2d Dep't 2003).

In accordance with the Appellate Division's directive, Justice Golia in October 2003 appointed defendant Piacentini as the Referee. Pl. Ex. 14. In January 2004, the Referee issued an Interim Report, which Plaintiffs-State Respondents moved Justice

Golia to reject.  Pl. Exs. 16-17.  In an order dated June 10, 2004,
Justice Golia denied Plaintiffs-State Respondents' motion, and
noted that any party who failed to adhere to the Appellate
Division's August 2003 decision would be subject to contempt.  Pl.
Ex. 21.  Thereafter, Plaintiffs-State Respondents noticed an appeal
to the Appellate Division, and moved that court for a stay of
Justice Golia's June 10, 2004 order pending resolution of the
appeal.  The Appellate Division summarily denied that motion on
July 23, 2004, Pl. Ex. 26, and upon information and belief,
Plaintiffs-State Respondents have yet to perfect that appeal.

On August 4, 2004, plaintiffs instituted this federal
action requesting injunctive relief to prevent "several
individuals, using the authority of the Supreme Court of the State
of New York, from destroying a well-established and well-
functioning Hindu Temple by removing its leadership, ordering it to
change its religious polity, and prevent it from engaging in
religious speech and exercise."  Compl. ¶ 4.  Plaintiffs allege
that the federal defendants who are petitioners in Venigalla
commenced that proceeding "in an attempt to effect a hostile
takeover of the Temple using the New York Religious Corporations
Law . . . and the New York courts."  Compl. ¶ 5.  Moreover,
plaintiffs allege that by applying provisions of the RCL and other
New York statutory law to the Society, Justice Golia and the
Referee have used their "judicial offices" to, inter alia, "[t]ake

control over the religious organization;" "[i]mpose a voting membership requirement upon the Temple"; and "[u]ltimately determine how the Temple is to be governed." Compl. ¶ 6.

Clearly, the claims asserted in plaintiffs' federal action (with the exception of that which alleges that the RCL is facially unconstitutional) constitute a frontal assault on the Appellate Division's August 2003 decision that found provisions of the RCL applicable to the internal governance of the Society, and that directed Justice Golia to appoint a referee to oversee the reorganization of the Society's internal governance structures. Indeed, plaintiffs' dissatisfaction with Justice Golia's subsequent rulings and the Referee's subsequent actions as referee directly stems from that Appellate Division decision, which none of the nine individual plaintiffs here yet have obtained leave to appeal to the New York Court of Appeals and, if necessary, to the U.S. Supreme Court. See Held Aff., Ex. 12 [Resp. 4/19/04 Mem. of Law to AD] at 10 n.7 (reiterating contention that "the Appellate Division's order is statutorily and constitutionally infirm" in order to preserve "these arguments for [further] review"). Thus, virtually all of plaintiffs' claims in the present action are barred by the Rooker-Feldman doctrine.

Moreover, the Memorandum of Law that plaintiffs have submitted here in support of their application for a preliminary injunction erases any lingering doubt that their "as applied"

claims seek to overturn the prior decisions of the state courts in Venigalla. For instance, plaintiffs assert that: (1) a preliminary injunction is necessary to restrain "Defendants from taking further action to violate the constitutionally protected autonomy of the Hindu Temple Society <u>through an unconstitutional application of the New York Religious Corporations Law in the state judicial process</u>" (Pl. Mem. at p. 3) (emphasis added); (2) "the greatest danger to the Hindu Temple Society's religious freedom is the State Defendants' [<u>i.e.,</u> the Supreme Court of the State of New York's, Justice Golia's, and the Referee's] complete failure to recognize such rights" (Pl. Mem. at p. 30); (3) "[t]he membership question is one that has been imposed on the Temple and its adherents by the Defendants' misapplication of the Religious Corporations Law and the Appellate Division's order" (Pl. Mem. at p. 32); (4) "Defendants have also conspired to deprive the Temple of its free exercise rights through skewed application of the RCL" (Pl. Mem. at p. 41); and (5) "[u]ltimately Defendants Golia and Piacentini justify all of their interference with Temple governance and religious exercise . . . on the basis of the Appellate Division's 200[3] decision" (Pl. Mem. at p. 42). These statements demonstrate that the instant case presents precisely the kind of situation for which the <u>Rooker-Feldman</u> doctrine was crafted.

## 2. Plaintiffs' "As Applied" Claims are "Inextricably Intertwined" With the Decisions of the State Courts

Even if this Court were to construe the claims constituting plaintiffs' "as applied" challenge to the RCL only as an <u>indirect</u> attack on the decisions rendered to date in <u>Venigalla</u>, such claims are so "inextricably intertwined" with those state court determinations as to warrant the <u>Rooker-Feldman</u> bar. <u>See</u> <u>Feldman</u>, 460 U.S. at 482 n.16 ("If the constitutional claims presented to a United States district court are inextricably intertwined with the state court's [decision], then the district court is in essence being called upon to review the state-court decision. This the district court may not do.").

In this Circuit, "'inextricably intertwined' means, at a minimum, that where a federal plaintiff had an opportunity to litigate a claim in a state proceeding, subsequent litigation will be barred under the <u>Rooker-Feldman</u> doctrine if it would be barred by principles of preclusion." <u>Vargas</u>, 2004 U.S. App. LEXIS, at *10. Thus, the doctrine typically is coextensive with principles of res judicata (claim preclusion) and collateral estoppel (issue preclusion). <u>Id.</u> However, where, as here, a party unsuccessful in a state court special proceeding commences a federal civil rights action pursuant to 42 U.S.C. §§ 1981, 1983, and 1985, New York's claim preclusion rules do not apply, because the state court that entertains such a proceeding lacks the power "to award the full measure of relief available" to a federal civil rights plaintiff.

See <u>Vargas</u>, 2004 U.S. App. LEXIS, at *10-*11.  Thus, to determine whether <u>Rooker-Feldman</u> bars plaintiffs' "as applied" claims, this Court must look to New York's collateral estoppel rules.

Under New York law, collateral estoppel applies where: (1) the issue in question "has necessarily been decided in the prior action and is decisive of the present action"; and (2) the party against whom the doctrine is asserted had a "full and fair opportunity to contest the decision now said to be controlling." <u>Buechel v. Bain</u>, 97 N.Y.2d 295, 303-04, 766 N.E.2d 914, 740 N.Y.S.2d 252 (N.Y. 2001).  "The party to be precluded from relitigating the issue bears the burden of demonstrating the absence of a full and fair opportunity to contest the prior determination."  <u>Id.</u> at 304.

Plaintiffs cannot satisfy that burden here.  By their own admission, plaintiffs have repeatedly and unsuccessfully challenged in the ongoing State Proceeding the constitutionality of RCL as it applies to them.  Indeed, in their Memorandum of Law filed in this Court, plaintiffs assert that: (1) they "have continually raised their constitutional claims before State Defendants [<u>i.e.</u>, Supreme Court of the State of New York, Justice Golia, and the Referee] since the time the State Defendants began to interfere in the Temple's religious activities and governance" (Pl. Mem. at p. 48); (2) both Justice Golia and the Appellate Division have "completely fail[ed] to recognize" the Society's rights to "religious freedom"

(Pl. Mem. 30-31); and (3) Justice Golia and the Referee "justify all of their interference with Temple governance and religious exercise . . . on the basis of the Appellate Division's 200[3] decision," but compliance with that decision "is not a sufficient answer to Plaintiffs' constitutional claims," because if the decision is unconstitutional, then Justice Golia is "bound by the Supremacy Clause of the United States Constitution to disobey it" (Pl. Mem. at p. 42).  These statements demonstrate that the plaintiffs have sought to enjoin the state courts' prior rulings after only having raised, and failed to prevail upon, an "as applied" challenge that the state courts necessarily rejected in paving the way for the enforcement of the RCL's provisions against the Society.  See Pl. Mem. of 4/19/04 at 3-38, attached to Held Aff. as Ex. 8; Pl. Ex. 26; see also Held Aff. Exs. 7, 9, 11 and 12.[7]

---

[7] Plaintiffs also argue that Justice Golia and the Referee "have consistently refused even to address the merits of Plaintiffs' asserted constitutional interests" (Pl. Mem. at p. 48), but the very exhibits that plaintiffs submitted to this Court in connection with their motion for a preliminary injunction belie that assertion.  See, e.g., Pl. Exs. 18, 22.  It appears that plaintiffs' true complaint lies with the fact that Justice Golia and the Referee continually have rejected plaintiffs' "as applied" constitutional challenge to the RCL in only a cursory manner.  But any failure by Justice Golia and the Referee to provide a more detailed discussion that meets with plaintiffs' satisfaction does not compel the conclusion that Justice Golia and the Referee have failed to consider the merits of plaintiffs' constitutional arguments.

Moreover, the same assertions in plaintiffs' Memorandum of Law that show that the state courts actually and necessarily decided plaintiffs' "as applied" challenge also establish that plaintiffs had a "full and fair opportunity" to litigate that challenge in the state courts.  See, e.g., Friedman, 39 N.Y.2d at 83 (state court may adjudicate constitutional challenge in special proceeding); Saratoga Water Servs., 190 A.D.2d at 42 (same).  That both the Appellate Division and Queens County Supreme Court continually have considered and rejected plaintiffs' constitutional assertions underscores the fact that plaintiffs previously had ample opportunity to contest the "as applied" constitutionality of the RCL.  See See Pl. Mem. of 4/19/04 at 3-38, attached to Held Aff. as Ex. 8; Pl. Ex. 26; see also Held Aff. Exs. 7, 9, 11 and 12.

Accordingly, regardless of whether plaintiffs' attack on the orders and judgments previously rendered by the state courts in the ongoing State Proceeding is considered direct or indirect, Rooker-Feldman bars all of their claims in the present federal action but those that challenge the constitutionality of the RCL on its face.

### 3.	The Rooker-Feldman Doctrine Bars the Federal Claims of the Six Plaintiffs Who Were Not Parties to State Court Proceedings

Without question, Rooker-Feldman precludes this Court from exercising jurisdiction over any "as applied" claim of the Hindu Temple and the nine individual plaintiffs who are parties to

<u>Venigalla</u>, the ongoing State Proceeding.  But the doctrine also bars this Court from considering the "as applied" claims of the six individual plaintiffs who are not parties to that proceeding.

To be sure, the Second Circuit recently observed that "<u>Rooker-Feldman</u> is not generally applied to bar a suit by those who were not parties to the original state court action."  <u>Hartford Courant Co. v. American Lawyer Media, Inc.</u>, 371 F.3d 49, 67-68 (2d Cir. 2004); <u>but see</u> <u>King v. James</u>, No. 91-CV-952, 1991 U.S. Dist. LEXIS 17332, at *9-*10 (N.D.N.Y. Nov. 29, 1991) (holding that <u>Rooker-Feldman</u> applies to plaintiff who was not party to state court proceedings, where she was sufficiently "aggrieved" under New York law as to have standing to appeal state court judgment under attack in federal court), <u>aff'd without opin.</u>, 969 F.2d 1041 (2d Cir. 1992), <u>cert. denied</u>, 506 U.S. 821 (1992).  For three reasons, the instant case provides a compelling exception to the general rule.

First, because <u>Rooker-Feldman</u> is animated by concerns of federalism and comity – indeed, the doctrine is designed to protect the "integrity of state court judgments," <u>Hachamovitch v. DeBuono</u>, 159 F.3d 687, 696 (2d Cir. 1998) – the "key inquiry" is whether "the federal plaintiff's interest in having a state rule set aside is inseparable from his interest in upsetting the particular state judgment based on that rule."  <u>Lemonds v. St. Louis County</u>, 222 F.3d 488, 495 (8th Cir. 2000) (citing <u>Feldman</u>, 460

U.S. at 482-86). As discussed _supra_ in Section A, the interests of the six individual plaintiffs not parties to _Venigalla_ are indistinguishable from the interests of the nine other individual plaintiffs who are in fact parties to that proceeding. _See_ Compl. ¶¶ 9-23; Pl. Ex. 10; _supra_ note 6. Every federal plaintiff without fail seeks to set aside the Appellate Division's August 2003 decision, as well as the subsequent orders of Justice Golia and actions of the Referee that sought to enforce that decision. Thus, the plaintiffs' collective attack on the "as applied" constitutionality of the RCL is "inseparable" from their effort to contest the Appellate Division's August 2003 decision. Because the relief sought in federal court therefore "both implicates a state court decision and has merely retrospective as opposed to prospective effect," _Lemonds_, 222 F.3d at 495 – indeed, "the entire upshot of a favorable decision in this case would be to unwind the decision of the state court," _id._ at 496 – the fact that six of the individual plaintiffs did not formally appear in _Venigalla_ does not prohibit the application of _Rooker-Feldman_ to their "as applied" claims.

Second, _Rooker-Feldman_ should bar the "as applied" claims of those six individual plaintiffs, because they have had notice of the ongoing state court proceeding; they were allegedly aggrieved by the Appellate Division's August 2003 decision, Justice Golia's subsequent orders, and the Referee's subsequent actions; and they

have opted not to intervene in <u>Venigalla</u>. <u>See</u> <u>Lemonds</u>, 222 F.3d at 496 (<u>Rooker-Feldman</u> applies where federal plaintiffs were "well aware" of state proceeding and had "ample opportunity" to bring their constitutional claims there); <u>King</u>, 1991 U.S. Dist. LEXIS 17332, at *9-*12 (federal plaintiff who was not a party to the state proceeding but was aggrieved by the state court's decision precluded by <u>Rooker-Feldman</u> from collaterally attacking that decision in federal court). For example, given that two plaintiffs (Hyma Reddy and Pathmini Panchararam) who are parties to <u>Venigalla</u> are "devotees" and members of the Society's Executive Committee, Compl. ¶¶ 11-12; Pl. Ex. 10; <u>see also</u> <u>supra</u> note 6, two other plaintiffs (Narenda Desai and Krishnaswamy Anandaram) not parties to that proceeding but who likewise are Hindu Temple "devotees" and members of the Temple's Executive Committee cannot claim to lack notice and the opportunity to participate in <u>Venigalla</u>, or that they were not aggrieved by the Appellate Division's August 2003 decision, Justice Golia's subsequent orders, and the Referee's subsequent actions.

Lastly, it would pervert the purpose of the <u>Rooker-Feldman</u> doctrine to permit the six individual plaintiffs who are not parties to <u>Venigalla</u> to maintain their "as applied" claims in federal court, when at the same time the Society and the nine individual plaintiffs with whom their interests are inextricably intertwined themselves are prohibited by <u>Rooker-Feldman</u> from

maintaining the same claims here.  As noted above, the doctrine "is based squarely on federal law and is concerned with federalism and the proper delineation of the power of the lower federal courts.  Such courts simply are without authority to review most state court judgments [habeas petitions being an obvious exception] – regardless of who might request them to do so."  <u>Lemonds</u>, 222 F.3d at 495 (citing <u>Rooker</u>, 263 U.S. at 416).  As with <u>Younger</u> abstention, <u>see</u> <u>supra</u> at 27-34, <u>Rooker-Feldman</u> "cannot be avoided simply by joining nonparties to the state court proceedings in order to procure injunctive and declaratory relief [in federal court] against that proceeding."  <u>Women's Comm. Health Ctr.</u>, 685 F.2d at 982.

**C.    Plaintiffs' Section 1983 Claims Against Justice Golia Are Barred By The Doctrine Of Absolute Immunity**

Under the doctrine of absolute judicial immunity, judges are given nearly complete protection from liability in civil suits. <u>Mireles v. Waco</u>, 502 U.S. 9, 11 (1991); <u>Cleavinger v. Saxner</u>, 474 U.S. 193, 199-200 (1985); <u>Stump v. Sparkman</u>, 435 U.S. 349, 356-59 (1978); <u>Pierson v. Ray</u>, 386 U.S. 547, 553-554 (1967).  All that is required for absolute judicial immunity to apply is that the judge not act in "clear absence of all jurisdiction," and that the judge be performing a "judicial act" or one that is judicial in nature. <u>See</u> <u>Stump</u>, 435 U.S. at 356-57.  Even allegations of malicious conduct, corruption, grave procedural error, or conspiracy can not override it.  <u>Id</u>.  It is undisputed that Justice Golia was, and is

currently, acting in his judicial capacity in presiding over the underlying civil action and any actions taken by him in the underlying civil action were and are judicial in nature.

The doctrine of absolute judicial immunity also serves to bar actions seeking injunctive relief. In 1996, Congress enacted the Federal Courts Improvement Act of 1996 ("FCIA"), § 309(c), Pub. L. No. 104-317, 119 Stat. 3847, 3853 (1996), amending 42 U.S.C. § 1983.[8] That amendment provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Montero v. Travis, 171 F.3d 757, 761 (2d Cir. 1999) (quoting FCIA). The purpose of the FCIA is to "restore[] the doctrine of judicial immunity to the status it occupied prior to the Supreme Court decision in Pulliam v. Allen,

---

[8] 42 U.S.C. § 1983, as amended, states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

(emphasis added).

-48-

466 U.S. 522 (1984)." See S. Rep. No. 104-366, 104th Cong., 2d Sess., 1996 U.S.C.C.A.N. 4202.

Prior to Pulliam, the common law recognized absolute judicial immunity barring suits for damages as well as prospective injunctive relief. See Pulliam, 466 U.S. at 557 (Powell, J., dissenting). The majority in Pulliam, however, departed from the common law and held that judicial immunity does not preclude an award of prospective injunctive relief under § 1983 against a judicial officer acting in his judicial capacity, nor does judicial immunity bar the award of attorney's fees under 42 U.S.C. § 1988. See Id., 466 U.S. at 542-544 (Powell, J., dissenting). In 1996, Congress enacted FCIA, overruling Pulliam.

According to the Senate report, FCIA amended 42 U.S.C. §§ 1983 and 1988 to "preclude the award of costs and attorney's fees against judges for acts taken in their judicial capacity, and to bar injunctive relief unless declaratory relief is inadequate." S. Rep. No. 104-366, 104th Cong., 2d Sess., 1996 U.S.C.C.A.N. 4202. FCIA attempted to "bar a Federal judge from granting injunctive relief against a State judge, unless declaratory relief is unavailable or the State judge violated a declaratory decree." Id. Congress specifically stated that "[t]his section does not provide absolute immunity for judicial officers. . . litigants may still seek declaratory relief, and may obtain injunctive relief if a declaratory decree is violated or is otherwise unavailable." Id.

FCIA's enactment sought to eliminate "frivolous and harassing lawsuits which threaten the independence and objective decision-making essential to the judicial process." Id.

The Second Circuit has held that as a result of FCIA, a plaintiff who alleges neither a violation of a declaratory decree nor the unavailability of declaratory relief cannot seek injunctive relief under § 1983 against a judicial officer. See, e.g., Montero, 171 F.3d at 761; Malizia v. Westchester County Dist. Attorney's Office, 164 F.3d 618 (2d Cir. 1998) (table disposition); Kampfer v. Scullin, 989 F. Supp. 194, 201-02 (N.D.N.Y.), aff'd, 175 F.3d 1008 (2d Cir. 1999); Saint-Fleur v. City of New York, No. 99 Civ. 10433 (WHP), 2000 WL 280328, *5 (S.D.N.Y. Mar. 14, 2000); see also, Bolin v. Story, 225 F.3d 1234, 1242 (10th Cir. 2000); Nollet v. Justices of the Trial Court of the Commw. of Mass., 83 F. Supp. 2d 204, 210 (D. Mass.), aff'd, 248 F.3d 1127 (1st Cir. 2000).

In the case at bar, plaintiffs have not alleged that a declaratory decree was violated or that declaratory relief is unavailable. See Montero, 171 F.3d at 761. Rather, plaintiffs seek declaratory relief, and as a result, are precluded from obtaining injunctive relief against Justice Golia. See Complaint; Wherefore Clause ¶¶ A, B; See Nollet, 83 F. Supp. 2d at 210; Jones v. Newman, No. 98-CV-7460 (MBM), 1999 WL 493429, *7 (S.D.N.Y. June 30, 1999); Finn v. County of Albany, No. 98-CV-844 (DNH), 1999 WL 291820, *5 (N.D.N.Y. May 5, 1999) Accordingly, any prospective

injunctive relief is barred under the FCIA and the doctrine of absolute judicial immunity.  See Montero, 171 F.3d at 761 (claim for injunctive relief barred under § 1983 where plaintiff alleged neither a violation of a declaratory decree nor the unavailability of declaratory relief).

### D.    Plaintiffs' Section 1985 Claims Are Without Merit

Similarly, plaintiffs' section 1985 claims must fail. Plaintiffs summarily alleged that defendants violated their civil rights under 42 U.S.C. §§ 1983 and 1985 by means of a conspiracy. Under 42 U.S.C. § 1983, "a complaint alleging a conspiracy to violate civil rights is held to a heightened pleading standard." Julian v. N.Y.C. Transit Authority, 857 F. Supp. 242, 252 (E.D.N.Y. 1994), aff'd, 52 F.3d 312 (2d Cir. 1995).  Indeed, "[i]t is incumbent on [plaintiffs] to state more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive [them] of [their] constitutional rights." Polur v. Raffe, 912 F.2d 52, 56 (2d Cir. 1990), cert. denied, 499 U.S. 937 (1991).  To establish a conspiracy under § 1983, plaintiffs must allege "specific facts suggesting that there was a mutual understanding among the conspirators to take action directed toward an unconstitutional end." Julian, 857 F. Supp. at 252, quoting Duvall v. Sharp, 905 F.2d 1188, 1189 (8th Cir. 1990) (per curiam).  The complaint is void of any such allegations.  To the extent that plaintiffs seek relief under 42 U.S.C. § 1985, plaintiffs must show

that the conspiracy was undertaken with racial or class-based animus. Gagliardi v. Village of Pawling, 18 F.3d 188, 194 (2d Cir. 1994). Again, the complaint is void of any such allegations.

### E. The Eleventh Amendment Bars Plaintiffs' Claims for Monetary, Injunctive and Declaratory Relief Against The Supreme Court of the State of New York

The Eleventh Amendment to the United States Constitution provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Eleventh Amendment immunity "represents a real limitation on a federal court's federal-question jurisdiction," Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 270 (1997) and bars a suit in a Court of the United States by a citizen of a state against that state, or one of its agencies, absent its consent to such a suit or an express statutory waiver of immunity. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 99 (1984).

The State of New York has not consented to suit in federal court, and the provisions of 42 U.S.C. §§ 1983 and 1985 were not intended to override a state's immunity. Quern v. Jordan, 440 U.S. 332, 343 (1979); Santiago v. New York State Department of Correctional Services, 945 F.2d 25, 31 (2d. Cir.) cert. denied, 502 U.S. 1094, 112 S. Ct. 1168 (1992). Thus, the Eleventh Amendment absolutely bars suits against the State or one of its agencies for

monetary relief, as well as suits seeking declaratory and injunctive relief.  See Pennhurst State School & Hospital v. Halderman, 465 U.S. at 100; Cory v. White, 457 U.S. 85, 91 (1982)); Richards v. State of New York, 597 F. Supp. 692, 693 (E.D.N.Y. 1984), aff'd, 767 F.2d 908 (2d Cir. 1985) (a state court is immune from suit under the Eleventh Amendment).

Eleventh Amendment immunity also extends to damage actions against state officials sued in their official capacities if the state is the real party in interest. Gan v. City of New York, 996 F.2d 522, 529 (2d Cir. 1993); Thaler v. Casella, 960 F. Supp. 691, 700 (S.D.N.Y. 1997).  See also Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060 (2d Cir. 1989); Sassower v. Mangano, 927 F. Supp. 113, 120 (E.D.N.Y. 1996) (suit against presiding and associate justices of the Supreme Court of New York, Appellate Division, Second Department barred).  To the extent plaintiffs seek attorneys' fees against Justice Golia, the Eleventh Amendment bars such claim.

**F.      New York's Religious Corporation Law**
**         Is Constitutional On Its Face**

Plaintiffs argue that the RCL is unconstitutional on its face because it violates the Free Exercise and Equal Protection Clauses of the constitution by allegedly providing more legal benefits to certain denominations through statutory provisions specifically designed for those denominations, while forcing minority faiths not specifically named in the RCL to distort their

-53-

religious structures to conform to the remaining legal categories in the RCL.[9]  See Pl. Mem. at p. 59; Compl. at p. 31.  According to plaintiffs, the RCL is sui generis in its use of denomination-specific provisions.  And even if there is a custom-tailored category in the RCL for Hindu temples, plaintiffs' argument continues, such custom-tailoring is necessarily unconstitutional in every instance because it can never be done so well so as not to burden the development of religious doctrines.  See Pl. Mem. at 60-61.  As discussed below, plaintiffs' facial challenges have no merit.

A statute is unconstitutional on its face, if it "could never be applied in a valid manner."  Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 797-98 (1984) (emphasis added); see also New York State Club Ass'n v. City of New York, 487 U.S. 1, 11 (1988); New York State Ass'n of Realtors, Inc. v. Shaffer, 27 F.3d 834, 839 (2d Cir. 1994).  That is, the facially invalid statute must be "unconstitutional in every conceivable application."  Taxpayers for Vincent, 466 U.S. at 796.  The Society does not attempt to make this showing, and in fact, it cannot.

---

[9]    Although plaintiffs raise their facial challenge under the Equal Protection Clause, their claim is more akin to one under the Establishment Clause, which prohibits statutes that treat some religious denominations more favorably than others.  See Larson v. Valente, 456 U.S. 228 (1982).

-54-

The First Amendment, which has been applied to the states through the Fourteenth Amendment, prohibits a state from enacting laws "prohibiting the free exercise" of religion. Fifth Avenue Presbyterian Church v. City of New York, 293 F.3d 570, 574 (2d Cir. 2002). As the Supreme Court has said, "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993). Government enforcement of laws or policies that substantially burden the exercise of sincerely-held religious beliefs is subject to strict scrutiny. Id. at 546; Fifth Avenue Presbyterian Church, 293 F.3d at 574. But "where the government seeks to enforce a law that is neutral and of general applicability," it need only "demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." Fifth Avenue Presbyterian Church 293 F.3d 574 (citing Church of Lukumi Babalu Aye, 508 U.S. at 531; Employment Div., Dep't of Human Res. of Oreg. v. Smith, 494 U.S. 872, 878-79 (1990)).

A law is neutral "if it does not infringe upon or restrict practices because of their religious motivation." Church of Lukumi Babalu Aye, 508 U.S. at 533. It has also long been recognized that the state may validly regulate religious

corporations so long as the regulation involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith, and the statutes are carefully drawn to leave control of ecclesiastical polity, as well as doctrine, to church governing bodies.  See Maryland and Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, 396 U.S. 367 (1970); Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church, 393 U.S. 440, 445 (1969); Kedroff v. St. Nicholas Cathedral, 344 U.S. 94 (1952).

Despite its use of provisions specifically tailored to certain religious denominations, the RCL provides a neutral statutory scheme to regulate the various religious groups in New York because it does not treat some religious denominations more favorably than others, nor does it have the purpose and effect of burdening any protected religious practices.  As an initial matter, the State of New York does not require any denomination to incorporate itself.  The RCL expressly recognizes unincorporated churches and undertakes no regulation of them or their affairs. RCL § 2 ("An 'unincorporated church' is a congregation, society, or other assemblage of persons who are accustomed to statedly meet for divine worship or other religious observations, without having been incorporated for that purpose.").  However, when a religious group wants the advantages of a corporate charter to obtain immunity from personal liability and other benefits, such as the acquisition,

sale and holding of property, it may elect to come under the RCL. The RCL in turn makes provisions for many denominations with corporate control appropriate to its own ecclesiastical order or, if a religious group does not fit within the specified denomination, it may incorporate under the more general provisions of Article 9 "Free Churches" and Article 10 "Other Denominations."

The legislative history of the RCL makes clear that the use of denomination-specific provisions is intended neither to further nor to burden the exercise of religion, but rather, to recognize the unique features of the denominations when regulating their corporate affairs as legal entities. Cf. Martinelli v. Bridgeport Roman Catholic Diocesan Corp., 196 F.3d 409, 431 (2d Cir. 1999) ("The First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."). This neutral purpose dates back to the first New York law for the incorporation of churches, which was enacted in 1784. Laws of New York 1784, c. 18. The 1784 Act was applicable to all religious denominations in New York and allowed for the appointment of trustees who would have a body corporate for the purpose of taking care of the temporalities of their respective denomination. The law remedied the formerly "illiberal and partial distributions of charters of incorporation to religious societies" within New York, which system had the effects of preventing charitable

donations "for want of proper person authorized by law to take charge of [such] donation[s]," and of "vesting in private hands" many estates originally purchased and given for the support of religious societies. Id. The preamble of the Act recognized that the state constitution guarantees "the free exercise and enjoyment of religious profession and worship, without discrimination or preference." Id.; see also N.Y. Const., art. I, § 3. Thus, the Act specifically provided that it should not be construed "to alter or change the religious constitutions or governments of either of the said churches, congregations or societies, so far as respects, or in any wise concerns, the doctrine, discipline or worship thereof." Laws of New York 1784, c. 18, at 618.

Soon after the passage of the 1784 Act, the Legislature passed the first denomination-specific law for the Dutch Reformed church because certain features of that church did not conform with the 1784 Act. See 1788 Laws of New York, c. 61. In place of the provisions relating to the election and re-election of trustees in the 1784 Act, the 1788 Act provided that the elders, deacons, and ministers of the Dutch Reformed church could act as the trustees for their respective churches or congregations. Id. Thereafter, the Legislature passed additional statutes for Protestant Episcopal churches in 1795, Roman Catholic churches in 1863, Greek churches in 1871, Baptist and Congregational churches in 1873, and Baptist

churches in 1876.  See 1895 Annual Report of the Commissioners of
Statutory Revision at 864.

        In 1909, the Legislature enacted the RCL, substituting it
for all existing general laws for the creation and temporal
administration of religious corporations.  Laws of New York 1909,
ch. 53.  In addition to general provisions applicable to all
denominations, the RCL retained the prior denomination-specific
provisions.  See N.Y. Relig. Corp. L., art. 2 (1909).  It also had,
as it does today, the categories of "free churches" and "other
denominations" under Articles 9 and 10 for religious groups that
did fall within the specified denominations.  Today, the RCL has
close to 30 denomination-specific articles, see RCL, art. 3-8, 11-
20.  Certain denominations are also referenced in Article 10.  See,
e.g., RCL § 190 (providing that Article 10 is applicable to an
Evangelical Lutheran church incorporated before October 1, 1895, if
the trustees were then elective as such and so long as they
continue to be elective as such); RCL § 202 (Trusts for Shakers and
Friends); § 207 (number of trustees of Jewish congregations and
voting by proxy at certain meetings).  However, all denomination-
specific articles or provisions maintain the original purpose of
allowing the creation of a corporate legal entity to take care of
the temporalities of the group without interference by the state as
to any religious matters of that group.  See, e.g., RCL § 5 ("The
trustee of every religious corporation shall have the custody and

control of all the temporalities and property, real and personal, belonging to the corporation and of the revenues therefrom, and shall administer the same . . .").  Indeed, with few exceptions, § 2-b of the RCL also makes the Not-For-Profit Corporation Law applicable to every religious corporation incorporated under the RCL regardless of denomination.  See RCL § 2-b[1] and [2].

No provision in the RCL, and plaintiffs have not cited to any, permits the interference with the religious structure of any denomination.  The regulatory scheme addresses only the secular, corporate aspects of religious corporations, and the religious group is charged with full knowledge of the corporate structure under which it chooses to incorporate.  Cf. United States v. Lee, 455 U.S. 252, 261 (1982) ("When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").  In other words, the use of denomination-specific statutory scheme is not intended to create a denominational preference; it is simply a neutral approach to regulate religious corporations that are justified by the actual differences among the structures of the various religious groups.

Indeed,  because the use of denomination-specific provisions is a rational way to regulate religious corporations, at least thirteen other states have such statutes with varying number

of denominations. See, e.g., N.J. Stat. tit. 16 (at least 17 denominations); Mich. Compl. Laws. Ch. 458 (at least 13 denominations); Kan. Stat. Ann. §§ 17-1711-13c, 17- 1716a-16c, 17-1732-33, 17-1753-55 (nine denominations); Wis. Stat. Ann. §§ 187.01-.19 (six denominations); Vt. Stat. Ann. tit. 27, §§ 781-944 (five denominations); Md. Code Ann., Corps. & Ass'ns §§ 5-314 to -338 (at least four denominations); Mass. Gen. Laws Ann. ch. 67, §§ 39-61 (three denominations); Me. Rev. Stat. Ann. tit. 13, § 2982 (three denominations); La. Rev. Stat. Ann. §§ 12:481-:483 (one denomination); Minn. Stat. Ann. §§ 315.15-.17 (two denominations); Del. Code Ann. tit. 27, §§ 114-115 (two denominations) N.H. REV. STAT. ANN. § 292:15-:17 (one denomination); Ill. Ann. Stat., ch. 805, para 110/50 (one denomination). That is, contrary to the Society's argument (Pl's Mem. at p. 61), the RCL's use of denomination-specific statutory scheme is not sui generis.

_____ There are several additional reasons for the existence of denomination-specific statutes that have nothing to do with a purpose of burdening or furthering a religion. See generally Patty Gerstenblith, Associational Structure of Religious Organizations, 1995 B.Y.U. L. Rev. 439, 452 (1995). First, these statutes are a continuation of the special charter system, in which the state authorized legal status to particular churches through the grant of a special charter. Id. Second, special incorporation statutes for particular religious denominations are an extension of the earlier

established status of particular churches and legislatures may be unwilling to disrupt any organizations that had formed under earlier statutes.  _Id_.  Third, special provisions for particular denominations sometimes are necessary because general religious incorporation statutes may not provide a suitable mechanism for some denominations.  _Id_.

Although plaintiffs contend that the RCL gives certain legal benefits to some denominations but not others, they point to no actual difference in treatment (or the type of legal benefits supposedly withheld from certain denominations) other than the simple fact that certain denominations have provisions specifically governing them under the RCL while others can choose to incorporate under either Article 9 or Article 10.  The mere fact that certain religious groups may not have a specified article in the RCL, however, does not amount to a denial of any legal benefit.  It cannot be disputed that religious groups incorporated under Articles 9 and 10 are entitled to all the privileges and immunity given to any other religious corporation.  As a practical matter, it is impossible to have a denomination-specific article for every existing or future religious group in New York and elsewhere in the world that may wish to be incorporated in New York. Moreover, the Legislature's provision of two separate categories, instead of having one catch-all category, actually reflects an attempt to tailor the statutory scheme to address one of the most significant

potential differences between religious groups: the fact that some religious groups are congregational in form and some are not. Article 9 thus provides a vehicle for religious groups that wish to have self-perpetuating boards of trustees with no voting members, while Article 10 seeks to accommodate religious groups that may have congregational forms of governance with voting members who pay dues. Compare RCL § 182 ("[a]ny vacancy occurring in the said [Article 9] board of trustees shall be supplied by the remaining trustees . . . .") and RCL § 183 ("the seats and pews [of an Article 9 free church] shall be forever free for the occupation and use, during public worship, of all persons choosing to occupy the same," and "no rent, charge or exaction shall ever be made or demanded for such occupation or use.") with RCL § 195 (membership voting requirements for Article 10 religious corporations). In actuality, these two catch-all categories provide more flexibility than those denomination-specific articles because they capture a wider range of current, as well as, future religious groups as to the secular aspects of their affairs. Plaintiffs' conclusory claim that by incorporating under either Article 9 or Article 10, a religious group would invariably be burdened in its free exercise of religion is therefore insupportable.

In sum, plaintiffs' facial challenge to the constitutionality of the RCL is without merit.

**G.    The State Defendants' Actions Pass Constitutional Muster**

Finally, although this Court need not reach the merits of this case, since commencement of the State Proceeding in 2001 by several of the defendants herein, the New York Supreme Court has permissibly applied neutral principles to resolve the dispute.[10] In adjudicating the parties' dispute over control of the Society's assets, the State Defendants' actions have fallen within the parameters of the First Amendment because they have adjudicated the dispute using the constitutional approach of applying neutral principles.

**1.    A State Is Entitled To Apply "Neutral-Principles" Of Law When Adjudicating Disputes Over Control Of Property Held By A Religious Organization.**

In <u>Watson v. Jones</u>, 80 U.S. 679, 722 (1871), the Supreme Court described three categories of cases concerning the right to

---

[10] Although plaintiffs argue that defendants Supreme Court of the State of New York, Justice Golia, and the Referee have violated plaintiffs' free exercise rights by adhering to an August 2003 Appellate Division decision that purportedly misinterpreted Article 9 of the RCL and directed the State Supreme Court to oversee a process by which the Society shall elect a new Board of Trustees (<u>see</u> Pl. Mem. 7 n.4, 13-15, 26-32, 41-42), plaintiffs' complaint stems from the fact that they failed to obtain leave to appeal the Appellate Division's August 2003 decision to the New York Court of Appeals and, if necessary, to the U.S. Supreme Court. As discussed <u>supra</u> Sections A and B, both <u>Younger</u> abstention and the <u>Rooker-Feldman</u> doctrine preclude this Court from adjudicating plaintiffs' effort to enjoin the ongoing state court process and reverse decisions rendered to date by the Appellate Division and New York Supreme Court. However, as the following section demonstrates, there is in any event no merit to the claim that defendants' actions to enforce the Appellate Division's ruling violate the Constitution.

property held by ecclesiastical bodies. The first category involves property held in trust for the specific purpose of sustaining, supporting, or propagating specific religious doctrine. Id. The second category involves property held by a religious congregation which is independent of any ecclesiastical associations, "and so far as church government is concerned, owes no fealty or obligation to any higher authority." Id. Religious organizations in this category are referred to as congregational or independent. Id. at 724. The third category of religious organizations described by the Court are hierarchical organizations; i.e., religious organizations, "in which there are superior ecclesiastical tribunals with a general and ultimate power of control . . . in some supreme judicatory over the whole membership of that general organization." Id. at 722; see also, e.g., New York Dist. of Assemblies of God v. Calvary Assembly of God, 64 A.D.2d 311, 313 (3d Dep't 1978) (recognizing two categories of religious organizations: congregational and hierarchical).

The Court in Watson held that "[r]eligious organizations come before us in the same attitude as other voluntary associations for benevolent or charitable purposes, and their rights of property . . . are equally under the protection of the law, and the actions of their members subject to its restraints." Id. at 714. In cases involving congregational or independent religious organizations, "where there is a schism which leads to a separation into distinct

and conflicting bodies," the Court held that "the rights of such bodies to the use of the property must be determined by the ordinary principles which govern voluntary associations." Id. at 725.

A few years later, in Bouldin v. Alexander, 82 U.S. 131 (1872), the Court reaffirmed a civil court's constitutional authority when called upon to settle disputes between different factions of religious organizations. Bouldin involved a minority group in a Baptist Church who sought to remove the acting board of trustees. Id. at 137. The Court held that the minority group's effort to remove the trustees was inoperative because the board had been duly constituted and the minority group's attempt to remove the trustees did not conform with the church's rules of governance. Id. at 137-140. Although the minority group argued that the First Amendment prohibited the Court from resolving the issue of church governance and membership, the Court rejected this argument: "This is not a question of membership of the church, nor of the rights of members as such," the Court wrote. Id. at 139. Rather, the dispute was over who properly controlled the church property, and was therefore a proper subject for judicial inquiry. Id. at 140.

Almost one hundred years after Bouldin, in Maryland & Virginia Eldership v. Church of God, 396 U.S. 367, 368 (1970), the Court held that the First Amendment was not even implicated by a Maryland Court of Appeals ruling in a church property dispute.

Although in resolving the dispute, the Maryland court had relied upon internal church documents – including the charters of the local church corporations and provisions in the constitution of the General Eldership – the Court dismissed the appeal for want of a substantial federal question because "the Maryland court's resolution of the dispute involved no inquiry into religious doctrine." Id.

In its most recent pronouncement on the resolution of property disputes involving religious organizations, Jones v. Wolf, 443 U.S. 595 (1979), the Court reaffirmed the principle that the First Amendment does not bar courts from resolving such matters. Jones involved a dispute over control of church property following a schism in a local church affiliated with a hierarchical church organization. Id. at 597. The Court held that while the First Amendment prohibits courts from resolving church property disputes on the basis of religious doctrine and practice, courts may resolve such disputes on the basis of "neutral principles of law." Id. at 602; see also Presbyterian Church v. Hull Church, 393 U.S. 440, 449 (1969) ("[T]here are neutral principles of law, developed for use in all property disputes, which can be applied without 'establishing' churches to which property is awarded.") This "method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges." Jones, 443 U.S. at 603.

In endorsing the constitutionality of the "neutral-principles" method, the <u>Jones</u> Court recognized that the method may "require[] a civil court to examine certain religious documents, such as a church constitution," to resolve disputes. <u>Id.</u> at 604. This does not offend the First Amendment, provided the "court . . . take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining" the intent of the parties. <u>Id.</u>[11] Religious societies, like any other corporate entity, can ensure that the control of church property is allocated in accord with religious precepts and the desires of the members, by specifying in the corporate charter or by-laws "what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy." <u>Id.</u> at 603-04; In this way, difficulties in applying the neutral principles method "should be gradually eliminated as recognition is given to the obligation of 'States, religious organizations, and individuals

---

[11] In hierarchical religious organizations, when the deed or corporate charter incorporates religious concepts such that interpretation of the instruments would require the civil court to resolve a religious controversy, the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body. <u>Jones</u>, 443 U.S. at 604 (citing <u>Serbian Orthodox Diocese v. Milivojevich</u>, 426 U.S. 696, 709 (1976)). It is not clear how courts should handle similar problems in congregational or independent religious organizations. <u>See</u> <u>Singh v. Singh</u>, 114 Cal. App. 4th 1264, 1280 & n.16 (2004) (noting that "it remains unclear whether the constitutional analysis for congregational and hierarchical religious institutions is identical.")

[to] structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.'" <u>Id.</u> at 604 (quoting <u>Presbyterian Church v. Hull</u>, 393 U.S. at 449.)

### 2. New York State Has Adopted The "Neutral-Principles" Method

In <u>First Presbyterian Church of Schenectady v. United Presbyterian Church</u>, 62 N.Y.2d 110, 120 (1984), the New York Court of Appeals explicitly adopted the "neutral-principles" method of adjudicating church property disputes. In a case involving a local church's attempt to withdraw from a larger, hierarchical organization, the court held that "[t]he fact that the Presbytery is part of a hierarchical body which may have determined the property dispute adversely to plaintiffs does not bind this court if it proves possible to decide the controversy through application of 'neutral principles.'" <u>Id.</u> "In applying neutral principles, the focus is on the language of the deeds, the terms of the local church charter, the State statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." <u>Id.</u> at 122 (citing <u>Jones v. Wolf</u>, 443 U.S. at 603; <u>Maryland & Va. Churches</u>, 396 U.S. at 368). The "neutral-principles" method has since been applied in dozens of New York cases involving disputes over control of property held by religious organizations. <u>See, e.g.</u>, <u>Park Slope Jewish Ctr. v. Congregation B'Nai Jacob</u>, 90 N.Y.2d 517, 521 (1997); <u>Morris v. Scribner</u>, 69 N.Y.2d 418, 422 (1987);

Karageorgious v. Laoudis, 271 A.D.2d 653, 654 (2000); Rende and Esposito Consultants, Inc. v. St. Augustine's Roman Catholic Church, 131 A.D.2d 740, 742 (2d Dep't 1987); Srour v. Bd. of Trustees, 2004 N.Y. Misc. LEXIS 681 at *6 (N.Y. Sup. Ct., June 3, 2004); St. Matthew Church of Christ Disciples of Christ, Inc. v. Creech, 196 Misc. 2d 843, 848 (N.Y. Sup. Ct. 2003).

### 3. The State Defendants Have Applied "Neutral Principles" To Resolve The Dispute Over Control Of The Society's Assets

There is no merit to plaintiffs' claim that defendants have violated the "church autonomy" doctrine by "interfer[ing] with the Hindu Temple Society." See Pl. Mem. at p. 26. Plaintiffs make three allegations in support of their claim: (a) "Defendants have conspired to install Defendant Piacentini as the formal and practical head of the Temple's religious polity," id. at 29; (b) "Defendants have conspired to force the Temple to accept members -- and a pseudo-democratic concept of membership -- that contravenes its religious beliefs," id. at 31; and (c) "Defendants have conspired to shift power away from the Temple's current Board of Directors," id. at 34. Plaintiffs fail to provide any support for these allegations, let alone demonstrate a substantial likelihood of success on the merits.

As an initial matter, plaintiffs fundamentally misstate the nature of the dispute between the Defendants-State Petitioners and Plaintiffs-State Respondents and of the actions taken by

defendants in the State Proceeding.  Remarkably, plaintiffs contend
that the dispute between the Defendants-State Petitioners and the
Plaintiffs-State Respondents is not a dispute involving property
held by a religious organization.  See id. at 26 n.9.  However, it
is clear from the New York State Supreme Court's February 14, 2002
decision that the present dispute arose when Defendants-State
Petitioners challenged the acting Trustees' right to spend millions
of dollars of the Temple's funds on construction projects without
approval by the members of the Society.  See Pl. Ex. 11 at p. 4.[12]
The Second Department ruled in favor of Defendants-State
Petitioners and held that Plaintiffs-State Respondents had no legal
right to continue utilizing Temple funds because the acting
Trustees "had acquired no legal right to such offices." Venigalla
v. Alagappan, 307 A.D.2d 1041, 1042 (2d Dep't 2003); Pl. Ex. 13.
As such, "their performance of functions of the offices is a
nullity." Id.  The case was then remanded to Justice Golia with
direction to appoint a referee to oversee the process of
establishing a duly constituted Board of Trustees.  Such a dispute

_____

[12] Indeed, in their brief to the Second Department, Defendants-
State Respondents admitted that the appeal fit "comfortably within
the parameters" of cases dealing with religious property disputes
which could be decided on the basis of neutral principles.  See
Held Aff., Ex. 3, at 8-9.  Thus, when the New York Supreme Court
issued a ruling favorable to their interests, plaintiffs apparently
believed the case involved a property dispute which was properly
decided on the basis of neutral principles.  Id. at 9.  But after
the Second Department reversed and ruled against plaintiffs'
interests, plaintiffs now maintain that the case does not involve
a property dispute.  See Pl. Mem. at 26 n.9.

over who may properly exercise control over the Society's assets is a paradigmatic example of a dispute involving property held by a religious organization.  See, e.g., Singh, 114 Cal. App. 4th at 1282 ("Since the Supreme Council is involved with the control the [sic] financial assets of the Temple, the term of office for the Supreme Council involves control of the Temple's property."); see also Bouldin, 82 U.S. at 139-40 (holding that court could adjudicate minority group's effort to remove trustees without violating the First Amendment); Watson, 80 U.S. at 725 ("Where there is a schism [in a religious organization] which leads to a separation into distinct and conflicting bodies, the rights of such bodies to the use of property must be determined by the ordinary principles which govern voluntary associations.").

Furthermore, plaintiffs either misunderstand the holding of the Second Department, seek to improperly use the federal courts to mount a collateral attack on that holding, or both.  The Second Department held, in no uncertain terms, that the acting Trustees

> acquired no legal right to such offices.  Elections of trustees of religious corporations that are not conducted pursuant to proper by-laws or statutory requirements are invalid and those persons purportedly elected acquire no legal right to such offices, and their performance of functions of the offices is a nullity.

Venigalla, 307 A.D.2d at 1042 (citations omitted).  Thus, plaintiffs argument that defendants have violated the First Amendment by "shift[ing] power away from the Temple's current Board of Directors," Pl. Mem. at p. 34, is baffling.  Power was shifted

away from the Society's acting Board of Directors because the Second Department held that the Board of Directors was not duly constituted, that the acting Trustees had no right to a Trustee position and that the acting Trustees therefore had no right to continue exercising the powers of a Trustee.[13]

To the extent that plaintiffs' argument is based on a claim that the Second Department's holding violated the First Amendment, plaintiffs' complaint must be dismissed because the court relied entirely upon "neutral principles" in reaching its decision. The Second Department relied on state statutes and the Society's own by-laws to reach a decision that the acting Board of Trustees was invalid. See Venigalla, 307 A.D.2d at 1041-43. This determination did not involve the resolution or interpretation of any religious or ecclesiastical disputes. See id. Indeed, the Defendants-State Respondents conceded as much in their brief to the Appellate Division when they urged it to affirm Justice Golia's April 18, 2002 Judgment (see Held Aff., Ex. 3, at p. 9)(noting that "errors of Board size and by-law provisions were properly pointed out by the lower court. . . [and] the prudence of a major construction project was properly reviewed." (emphasis added)).

---

[13] It is not clear on what basis plaintiffs' even have standing to represent the "the Temple" since the Second Department held that they were not legally acting as "the Temple's" Board of Trustees. See Venigalla, 30 A.D.2d at 1042, 763 N.Y.S.2d 765. Thus, plaintiffs' references to "the Temple" are more properly read as references to plaintiffs themselves.

The only issue plaintiffs raise with any arguably religious significance is the trial court's effort to determine who was entitled to vote for the Society. Here too, however, the defendants have relied principally on the Society's own by-laws, which contain an entire Article on "Membership and Voting Qualifications." See Pl. Ex. 7 at Article III. This Article establishes qualifications for membership, different types of memberships, a process for applying for membership, membership fees, a right to vote, and even voting procedures which permit members to vote by absentee ballot in (a) elections to the Board of Trustees and Managing Committee and (b) proposed changes, alterations, or amendments to the by-laws. Id. It is clear from the Referee's Interim Report that it is these provisions of the by-laws which are the basis on which the membership determination is being made. See Pl. Ex. 16 at pp. 2-3 ("The procedure to be followed shall derive its legitimacy from the By-Laws of the Society.")

Moreover, as the Referee has noted, it is his intent to have the Managing Committee, which is to be comprised of three members from the existing Board of Trustees and three Petitioners, draft an application for membership which must strictly conform to the Society's By-Laws. Pl. Ex. 17 at pp. 2-3. The only input the Referee would have on the issue of someone becoming a voting member, is to cast a tie-breaking vote for someone who has met the

requirements proscribed by the by-laws, if the Committee cannot agree.  Id.  Further, if the parties exercise their duties on the Management Committee in good faith, the Referee will never have to issue any tie-breaking vote.  Id.

Finally, it would be poor precedent to permit trustees who have no legal right to their positions in a religious institution, to hold those positions in perpetuity by simply refusing to agree to any definition of the institution's members that would threaten to remove their power to manage the institution, especially when that institution regularly solicits money from the public, and then, alternatively, seeks to shield their conduct by crying foul under the First Amendment.

As in Maryland and Va. Eldership, 396 U.S. at 367, where the Maryland Court of Appeals relied upon provisions of state statutory law, language in the church deeds, the terms of the church charter, and provisions of the church constitution to resolve a dispute over control of church property, defendants in this case have applied "neutral principles" to the resolve the dispute over control of the Society's assets.  Thus, as in Maryland and Va. Eldership, defendants actions do not even present a federal question for this court to decide.  See id. at 368.

To the extent there are any religious issues implicated in this case, it is plaintiffs who are creating them in asking this Court to decide the validity of their assertion that enforcing the

Society's own by-laws would contravene the religious beliefs of the Society.  <u>See</u> Pl. Mem. at pp. 31-34.  However this is precisely what the Supreme Court has cautioned judges <u>not</u> to do.  <u>See</u> <u>Jones</u>, 443 U.S. at 604 ("[A] civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining," the intent of the parties in drafting the document.)  This Court, like the New York State courts, must analyze the by-laws using "neutral principles," not one of which supports plaintiffs' assertion.  Put simply, this Court cannot, on the basis of plaintiffs' affidavits, read into by-laws which explicitly provide for voting membership a prohibition against voting membership.  Thus, not only are plaintiffs unlikely to succeed on the merits of the claim, it would arguably violate the First Amendment for this Court to ignore the "neutral principles" in this case and prevent defendants from enforcing the Society's by-laws on the basis of plaintiffs' assertion that these by-laws contravene their religious beliefs.  As the court observed in <u>Watson v. Christie</u>, 288 A.D.2d 29, 29 (1st Dep't 2001), "[t]his is not a case where [the state-court petitioners were] seeking to force the church to perform some act against its will or seeking to define membership in a way opposed by the church. [Petitioners were] simply trying to enforce [their] secular rights as [members], using the [Temple's] own criteria of membership."  Thus, defendants

did not violate the First Amendment in granting relief to the Defendants-State Petitioners.

**4. Persuasive Authority Supports Defendants' Actions Under The First Amendment**

Other courts facing similar circumstances have uniformly held that the actions taken by defendants in this case are consistent with the First Amendment.

In a recent case involving circumstances very similar to the present action, <u>Singh v. Singh</u>, 114 Cal. App. 4th 1264, 1269 (2004), the California Court of Appeal upheld the decision of the trial court as consistent with the First Amendment. <u>Singh</u> involved an action by members of a Sikh Temple's Supreme Council who refused to vacate their positions following a March 2002 meeting in which members of the temple purported to hold an election removing the Council-members. <u>Id.</u> at 1272. The plaintiffs requested that the court determine the validity of the March 2002 election or to order a new election. <u>Id.</u> "The trial court held that it had jurisdiction to decide which persons were entitled to manage the Sikh Temple, including control of significant corporate assets, by applying neutral principles of law, focusing on the bylaws themselves," and ordered that a new election be held. <u>Id.</u> at 1274. Because the Sikh Temple had not maintained membership records, the trial court also ordered the creation of a membership committee, consisting of four representatives appointed by plaintiffs and four representatives appointed by defendants for the purpose of

admitting members upon application.  <u>Id.</u>  Membership disputes that

the membership committee was unable to resolve by majority vote

were to be submitted to a special master for decision.  <u>Id.</u>  The

California Court of Appeal affirmed.  <u>Id.</u> at 1269.

In reaching its decision, the court rejected defendants'

argument -- identical to the argument advanced by plaintiff's in

the instant case -- that the trial court's order violated the First

Amendment.  The Court of Appeal noted that:

> where, as here, the question presented is whether the
> property and funds of the church are being handled in
> accordance with the by-laws and rules of the church
> corporation or such by-laws and rules are being properly
> observed by the governing body of the church, those
> aggrieved may seek redress through court action.

<u>Id.</u> at 1278 (internal quotation marks and citation omitted).

The court further held that "[s]ince the Supreme Council

is involved with the control the [sic] financial assets of the

Temple, the term of office for the Supreme Council involves control

of the Temple's property."  <u>Id.</u> at 1282.  "[C]ourts have

jurisdiction over disputes involving the control of property, even

if they touch upon ecclesiastical concepts, as long as the court

does not have to settle religious schisms and it can use neutral

principles of law to settle the dispute."  <u>Id.</u> (citations omitted).

As the court observed:

> Where a schism has developed within a church, resulting
> in dispute as to who holds ultimate authority for
> congregational or corporate decisions, civil courts are
> unavoidably put to the task of identifying the true or
> legitimate authority.  To do otherwise would be to deny

all legal protection to churches and allow church
disputes to be settled by physical force.

Id. at 1284.

The Court of Appeal also rejected the defendant's
argument that the trial court's order that an election be held
violated the Establishment Clause: "[T]he court's ruling that an
election should occur resulted from the application of neutral
principles of law and the Corporations Code when interpreting the
bylaws." Id. at 1285. Finally, the Court of Appeal found that the
trial court's order establishing a membership committee consisting
of four members appointed by plaintiffs and four members appointed
by defendants was consistent with the First Amendment. Id. at
1287-89.

In another case, Ward v. Jones, 154 Misc. 2d 597, 600
(N.Y. Sup. Ct. 1992), members of a Baptist church challenged a
trustee's claim to lifetime tenure on the board. In resolving the
dispute, the court found that it "must be guided by the church
constitution and bylaws as well as past and accepted custom." Id.
at 601 (citations omitted). The court concluded that the trustee
was not entitled to lifetime tenure and directed a new election for
trustees to be conducted no later than 60 days after service of the
judgment. Id. at 602-03. Furthermore, the court decided who was
entitled to vote in this election based on the bylaws of the
church. Id. at 603.

Courts in other cases involving disputes over control of a religious organization have found similar approaches constitutional. See, e.g., Srour v. Bd. of Trustees of the Sephardic Congregation, 2004 N.Y. Misc. LEXIS 681 at *9-10 (N.Y. Sup. Ct. June 3, 2004) ("[A] court generally does have jurisdiction to determine whether a church has abided by its own by-laws. . . . Moreover, even though there is a general prohibition against judicial interference in issues concerning the establishment of membership criteria by a church or congregation, there is some authority that a court may determine whether the church or congregation in question had adhered to its own by-laws in making determinations as to the membership status of individual congregants." (citations omitted)); St. Matthews Church of Christ Disciples of Christ v. Creech, 196 Misc. 2d 843, 848 (N.Y. Sup. Ct. 2003) ("[A]lthough the matter of selecting a clergyman for a church is ecclesiastical, it is within the province of a court to determine the dispute as to a given selection where, as here, questions of control and management of temporalities will be settled by the determination of such disputed ecclesiastical matter." (internal quotation marks and citation omitted)); see also Islamic Ctr. v. Islamic Science Found., 262 A.D.2d 362, 363 (2d Dep't 1999) (analyzing Islamic Center's by-laws to determine whether plaintiffs were members).

By contrast, <u>Kedroff v. St. Nicholas Cathedral</u>, 344 U.S. 94, 95-96 (1952), on which plaintiffs principally rely, is easily distinguishable.  <u>Kedroff</u> involved a New York State statute which transferred control of Russian Orthodox churches in North America away from the Supreme Church Authority in Moscow to a convention of American church officials.  The Court held that the statute violated the Free Exercise Clause because it required Russian Orthodox churches in North America to conform to church statutes adopted at a specific convention.  <u>Id.</u> at 107-08.  "Legislation that regulates church[es] . . . by requiring conformity to church statutes adopted at a general convention . . . prohibits the free exercise of religion."  <u>Id.</u> at 108.

Kedroff did not involve issues as to whether the church was properly following its own constitution or by-laws, or whether the leadership had been properly constituted.  <u>See</u> <u>id.</u> at 156. Rather the Court found that "[f]reedom to select the clergy, <u>where no improper methods of choice are proven</u>, we think, must now be said to have federal constitutional protection."  <u>Id.</u> at 116 (emphasis added); <u>see also</u> <u>id.</u> at 116 n.23 ("[W]e do not understand the supreme court, in <u>Watson v. Jones</u>, to hold that an open and avowed defiance of the original compact, and an express violation of it, will be taken as a decision of the supreme judicatory which is binding on the civil courts." (quoting <u>Brundage v. Deardorf</u>, 55 F. 839, 847 (1893)).  Thus, the Court explicitly left open the

possibility that courts may intervene in cases such as this one, where improper methods of selecting religious leaders <u>are</u> proven.

**H.  Plaintiffs' Religious Exercise, Free Speech, Freedom of Association, and Due Process Arguments Must Fail**

Similarly, plaintiffs' Religious Exercise, Free Speech, Freedom of Association, and Due Process arguments are fatally flawed because they all rest on the false premise that plaintiffs are the proper trustees of the Society.

A substantial portion of plaintiffs' brief is directed at defendants' efforts to preserve the assets of the Society until there is a duly constituted Board of Trustees.  For example, plaintiffs argue that defendants have conspired to prevent plaintiffs from engaging in religious practices because Justice Golia has forbidden plaintiffs from entering into contracts on behalf of the Society.  <u>See</u> Pl. Mem. at p. 39.  Similarly, plaintiffs suggest that defendants have conspired to compel plaintiffs to engage in certain undesired speech based on an order that an application for membership be sent out on Society letterhead.  <u>Id.</u> at 44.  These arguments must be rejected because they fail to acknowledge the Second Department's holding that plaintiffs were not properly placed on the Board of Trustees and are therefore not legally entitled to act on behalf of the Society.

It is black letter law that one cannot act on behalf of a corporation – religious or secular – without proper authority.  <u>See</u> 18B Am. Jur. 2d <u>Corporations</u> § 1341 ("The corporate

principal can act only through its officers, agents, and employees."). Indeed, "the primary purpose of the Religious Corporations Law is to provide an orderly method for the administration of property and temporalities dedicated to the use of religious groups, and to <u>preserve them from exploitation by those who might divert them from the true beneficiaries of the corporate trust</u>." <u>Morris v. Scribner</u>, 69 N.Y.2d 418, 423 (1987) (emphasis added). Thus, it is not a violation of the First Amendment or Due Process Clause for a court to prohibit an unauthorized individual from utilizing the resources of a religious corporation.

### H. Plaintiffs' Religious Exercise, Free Speech, Freedom of Association, and Due Process Arguments Must Fail

Similarly, plaintiffs' Religious Exercise, Free Speech, Freedom of Association, and Due Process arguments are fatally flawed because they all rest on the false premise that plaintiffs are the proper trustees of the Society.

It is black letter law that one cannot act on behalf of a corporation – religious or secular – without proper authority. <u>See</u> 18B Am. Jur. 2d <u>Corporations</u> § 1341 ("The corporate principal can act only through its officers, agents, and employees."). Indeed, "the primary purpose of the Religious Corporations Law is to provide an orderly method for the administration of property and temporalities dedicated to the use of religious groups, and to <u>preserve them from exploitation by</u>

-83-

those who might divert them from the true beneficiaries of the corporate trust." Morris v. Scribner, 69 N.Y.2d 418, 423 (1987) (emphasis added). Thus, it is not a violation of the First Amendment or Due Process Clause for a court to prohibit an unauthorized individual from utilizing the resources of a religious corporation.

In the instant case, plaintiffs argue that defendants have (a) conspired to prevent plaintiffs from engaging in religious practices, (b) censored plaintiffs' religious speech; and (c) violated plaintiffs' right to association. See Pl. Mem. at 37-48. However, the basis for these claims are orders aimed at preserving the Society's resources until the "true beneficiaries of the corporate trust," are determined. Morris, 69 N.Y.2d at 423. See, e.g., Pl. Mem. at p. 39 (attacking Justice Golia's order forbidding plaintiffs from entering into contracts on behalf of the Society). These arguments must be rejected because they fail to acknowledge that plaintiffs have no legal standing to enter into contracts on behalf of the Society. See Venigalla, 307 A.D.2d at 1042. Thus, Defendants' orders prohibiting plaintiffs from doing so do not violate the constitution.

## CONCLUSION

For the foregoing reasons, plaintiffs' application for a for a preliminary injunction should be denied.

Dated:    New York, New York
        August 20, 2004

Respectfully submitted,

ELIOT SPITZER
Attorney General of the
 State of New York
<u>Attorney for the State Defendants</u>
By:

/s/

AMY HELD(AH 6165)
Assistant Attorney General

JEFFREY METZLER
CONSTANTINE SPERES
Assistant Attorneys General

ROBERT H. EASTON
JEAN LIN
Assistant Solicitors General
 <u>of Counsel</u>