# PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

FILED
IN CLERK'S OFFICE
US DISTRICT COURT. E.D.N.Y.

★ AUG 1 0 2004 ★

BROOKLYN OFFICE

## EXHIBIT LIST

| | |
|---|---|
| Exhibit 1. | Affadavit of Uma Mysorekar |
| Exhibit 2. | Affidavit of Subramaniam Sundararaman |
| Exhibit 3. | Affidavit of Narenda Desai |
| Exhibit 4. | Affidavit of William Burke |
| Exhibit 5. | Affidavit of Shivakumar Prabhat |
| Exhibit 6. | Articles of Incorporation of the Hindu Temple Society |
| Exhibit 7. | 1970 Draft Bylaws (never adopted) of the Hindu Temple Society |
| Exhibit 8. | Study of the Hindu Temple Society by R. Scott Hanson |
| Exhibit 9. | Order of the Supreme Court, Queens County, dismissing the 1999 Lawsuit |
| Exhibit 10. | Petition in the State Court Action dated June 10, 2001 |
| Exhibit 11. | Decision of Defendant Joseph Golia dated February 14, 2002 |
| Exhibit 12. | Judgment of Defendant Joseph Golia dated April 18, 2002 |
| Exhibit 13. | *Venigalla v. Nori*, 763 N.Y.S.2d 765 (N.Y.App.Div. 2003) (Mem.) |
| Exhibit 14. | Order of Defendant Joseph Golia dated October 23, 2003 |
| Exhibit 15. | Order of Defendant Joseph Golia dated December 12, 2003 |
| Exhibit 16. | Interim Report of Defendant Piacentini dated January 6, 2004 |
| Exhibit 17. | Response of Defendant Piacentini to Motion to Reject Referee's Report dated February 5, 2004 |
| Exhibit 18. | Order of Defendant Joseph Golia dated April 19, 2004 |
| Exhibit 19. | Letter of Defendant Piacentini to Krishnan Chittur and William Burke dated May 11, 2004 |
| Exhibit 20. | Order of Defendant Joseph Golia dated May 18, 2004 |

Exhibit 21.        Order of Defendant Joseph Golia dated June 10, 2004

Exhibit 22.        Order of Defendant Joseph Golia dated July 7, 2004

Exhibit 23.        Letter of Defendant Piacentini to William Burke dated July 7, 2004

Exhibit 24.        Letter of William Burke to Defendant Piacentini dated
                   July 13, 2004

Exhibit 25.        Order of Defendant Joseph Golia dated July 13, 2004

Exhibit 26.        Order of Appellate Division dated July 23, 2004

Exhibit 27.        Draft Letter of Defendant Piacentini to Potential "Members" of the
                   Hindu Temple Society

Exhibit 28.        Approved "Membership" Application Form

Exhibit 29.        Draft Guidelines for Handling "Membership" Applications

Exhibit 30.        Draft Form of Rejection of "Membership" Application

Exhibit 31.        E-mail sent from Defendant Krishnamurthy Aiyer to Roman
                   Storzer dated April 9, 2004

Exhibit 32.        Letter from Defendant Krishnamurthy Aiyer to Defendant
                   Anthony Piacentini dated August 1, 2004

Exhibit 33.        Supplemental Affirmation of Krishnan Chittur, Esq. in Further
                   Opposition to Respondents' Application for Stay dated July 9,
                   2004

# EXHIBIT 1

| | |
|---|---|
| THE HINDU TEMPLE SOCIETY OF NORTH AMERICA, a New York religious corporation; NARENDRA DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; HYMA REDDY; DR. PATHMINI PANCHACHARAM; DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH SHANTILAL PANCHAL; RAJ GOPAL IYER, <br><br> Plaintiffs, <br><br> v. <br><br> THE SUPREME COURT OF THE STATE OF NEW YORK, ANTHONY J. PIACENTINI, in his official capacity; JOSEPH G. GOLIA, in his official capacity; SAMBASIVA RAO VENIGALLA; KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA, NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER, and VASANTRAI M. GANDHI, <br><br> Defendants. | CASE NO. |

# AFFIDAVIT OF UMA MYSOREKAR, M.D.

# AFFIDAVIT OF UMA MYSOREKAR, M.D.

DR. UMA MYSOREKAR,M.D., on oath deposes and says:

1.      I am the President of the Hindu Temple Society of North America, Inc., a devotee of the Temple, a member of its Board of Trustees and a Respondent in the State Court Action.

2.      In 1998 there was an election among the Trustees for two lifetime seats on the Board of Trustees. Krishna Urs, at that time the Chairman of the Board and Raghavarao Polavarapu, Co-chair were the candidates. The Board of Trustees did not approve their selection as Lifetime Trustees. Urs and Polavarapu then brought suit challenging their election. A motion for preliminary relief was denied in that action, and to the best of our knowledge there have been no further proceedings. In 1999 their regular terms on the Board expired and were not renewed.

3.      Upon information and belief, Raghavarao Polavarapu, is a native of Andhra Pradesh as are Defendants Sambasiva Rao, Venigalla, Kattinger V. Rao; Anand Mohan; Venkaiah Dama, and Nehru E. Cherukupalli.

4.      After the conclusion of the Temple's 2002 Annual Assembly Defendant Venigalla approached Plaintiff Mysorekar and urged her to make Polavarapu a Trustee again.

5.      Upon information and belief ,subsequently some of the Defendants sent a report to several hundred Indians, the Telugh community, saying that they had reported the Temple to the New York State Attorney General.

6.      Defendants Venigalla, Dama, Cherukupalli, Mohan and Rao filed a complaint with the Attorney General in April 2000. It alleged that they were entitled to membership rights, were being deprived of them and that there was financial

mismanagement. The Attorney General investigated and has taken no action against the Temple or anyone associated with it.

7.      I have been informed by Mr. Alan Zion, of the Great Nations Investment Corporation, the company which had assisted the Temple in floating bonds in 1993,1994 and 1997, that Defendant Venigalla called him in 2000 and claimed that the Board of Trustees was illegal.

8.      I have also been informed, and upon information it is my belief that an anonymous letter making the same claims was also received by the Temple's mortgage holder, The Bank of the West.

9.      The following documents which are attached as Exhibits have been provided by me. I received them in my capacity a President of the Temple:

| | |
|---|---|
| Exhibit 6. | Articles of Incorporation of the Hindu Temple Society |
| Exhibit 7. | 1970 Draft Bylaws (never adopted) of the Hindu Temple Society |
| Exhibit 8 | Study of the Hindu Temple Society by R. Scott Hanson |
| Exhibit 9. | Order of the Supreme Court, Queens County, dismissing the 1999 Lawsuit |
| Exhibit 27. | Draft Letter of Defendant Piacentini to Potential "Members" of the Hindu Temple Society |
| Exhibit 28. | Approved "Membership" Application Form |
| Exhibit 29 | Draft Guidelines for Handling "Membership" Applications |
| Exhibit 30. | Draft Form of Rejection of "Membership" Application |
| Exhibit 31. | E-mail sent from Defendant Krishnamurthy Aiyer to Roman Storzer dated April 9, 2004 |
| Exhibit 32. | Letter from Defendant Krishnamurthy Aiyer to Defendant Anthony Piacentini dated August 1, 2004 |

Dated: August, 2, 2004
    Flushing, New York

_Uma Mysorekar, M.D._ (signature)

Uma Mysorekar, M.D.

On August 2, 2004, Uma Mysorekar, M.D, a person known to me, came before me and executed the foregoing affidavit.

_Damodar R Bondugula_ (signature)

Notary Public, State of New York

**DAMODAR R. BONDUGULA**
Notary Public, State of New York
NO. 01BO6051315
Qualified in Queens County
Commission Expires Nov 20, 2006

# EXHIBIT 2

| | | |
|---|---|---|
| THE HINDU TEMPLE SOCIETY OF NORTH AMERICA, a New York religious corporation; NARENDRA DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; HYMA REDDY; DR. PATHMINI PANCHACHARAM; DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH SHANTILAL PANCHAL; RAJ GOPAL IYER, <div align="right">Plaintiffs,</div> v. THE SUPREME COURT OF THE STATE OF NEW YORK, ANTHONY J. PIACENTINI, in his official capacity; JOSEPH G. GOLIA, in his official capacity; SAMBASIVA RAO VENIGALLA; KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA, NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER, and VASANTRAI M. GANDHI, <div align="right">Defendants.</div> | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. |

## AFFIDAVIT OF SUBRAMANIAM SUNDARAMAN, CHAIRMAN OF THE BOARD OF TRUSTEES

Subramaniam Sundaraman, on oath deposes and says:

1. I am Chairman of the Board of Trustees of the Hind Temple Society of North America (the "Temple"), a respondent in the State court proceedings and a plaintiff in this action.

1

2. I have been a devotee of the Temple since its founding in 1970. I was one of the earliest devotees and was present when the consecration took place. In those days we were a small group, perhaps fifty or sixty families. I have also been a Trustee since 1995.

3. As to the alleged 1970 bylaws, we never saw them or used them, nor did I ever hear them referred to in the Temple. They were first shown to us by the petitioners in the State court action in connection with that action. They claimed that they obtained it from the IRS and that it was apparently submitted by the attorney for the proxy organizers of the Temple, in connection with the application for tax-exempt status. All the proxy organizers and their attorney are now deceased.

4. There is nothing in the records of the Society which shows that we ever had a copy of these 1970 bylaws or that they were ever adopted. Indeed, the Temple officials always discussed the Temple organization as a non-membership religious corporation, and said that it was such because it was organized under religious and non-profit laws that permitted this. We carefully worked with the bylaws that we believed we had and actually amended them about 12 times since 1978. None of them provided for voting membership. They did include various provisions for non-voting membership.

5. The study of our Temple by Dr. Hanson, included in the record of the State court proceeding (but stricken without explanation from the record submitted to the Appellate Division on the first appeal by the Supreme Court Queens) shows that the Temple never conceived itself as having

voting members.

6. Indeed, the ethical precepts of Hinduism tell us that decisions about temples should be in the hands of elders who have demonstrated shown the wisdom, devotion and spiritual ability to steward the sacred place, and the place itself is sacred, apart from the people who come to it or their activities, the place itself is the body of the God.

7. Traditionally in India the trustees or administrators of temples were usually chosen by descendants of the maharajahs or others who endowed or financed the temples in conjunction with spiritual leaders.

8. Our Trustees have been chosen by the Board from among people who have demonstrated spiritual commitment to the Temple through their contributions of service, money and or time. Most of the petitioners in State Court Action are not regular attendees at the Temple, much less people who volunteer time or service.

9. One of the purposes of Hindu practice is to learn and practice giving up ego, personal recognition, competition, jealousy, etc. This is how we are to reach a higher spiritual level. Politics is inimical to this practice and religious worldview.

10. Our Trustees have never taken any salary or money from the Temple. Service on the Board must be an act of spiritual service.

11. It is a matter of concern to me that at the moment that the Temple is about to embark on major construction of a rajagopuram– the real heart of the temple as well as a library and space for more devotees. Individuals who have not demonstrated a commitment to service are attempting to gain control over the large sums of money that will be involved in this project.

12. The actions of the referee and the Queens County Supreme Court have also prevented us from going ahead with this construction activity. We have the funds, we have the permits, but we are not able to proceed because of their orders. A rajagopuram is a tall tower covered with carvings of Gods and other sacred things. It is considered the "heart" of temples. We have long planned to build it, but now we are prohibited from doing so.

13. We also believe that even turning over the mailing list of the Temple is wrong. The mailing list is composed of various pieces of information: anyone who visits the Temple for any reason at any time is able to sign the list. Not all of them are Hindus or devotees of the Temple. This is especially true since this is probably the first temple in the U.S. and one of the most prominent, so people come to visit just to see a Hindu temple. In addition the list contains addresses and phone numbers for those who give them. Also such personal information as birth dates, wedding dates, etc. is recorded by some people so that offerings may be made for them on those dates. Additionally contributions, etc. are listed. Our people who have given us this information gave it to us for purposes of assisting them in practicing their religion and we know they expect us to keep it private. We have consistently refused to share the mailing list with others. We will be betraying their trust if we in fact hand this over to a government authority or to other people who are not under any restrictions as to what they do with them.

4

14. It is even more troublesome to our devotees that the referee is not a Hindu. The activity of a non-believer in taking to himself the power to determine how our Temple should be organized and who should participate profanes the Temple.

15. Causing political conflicts and political contests also damages the Temple because self-seeking, ego and conflict is condemned by Hindu practice. Fostering such activity is in fact inimical to the purpose of the Temple.

16. I was appointed one of the Temple's three representatives to the Referee's Managing Committee, which the Supreme Court Queens County has empowered to hold a "reorganization meeting" under the so-called "1970 bylaws." In this capacity I attended meetings of the Managing Committee at the Referees office on May 26, 2004, July 6, 2004 and July 14, 2004.

17. The actions of the referee also undermined our trust that he will conduct himself in a manner that will be in any way compatible with Hindu practice. In addition to saying (as has Justice Golia) that he does not believe that there are any possible freedom of religion issues, he has also refused to allow our lawyers to be present at meetings of his "Managing Committee" and has threatened us that he would vote to determine who the members are. He also called back the three petitioner members of the Managing Committee after we had left the meeting of the Managing Committee and appeared to hold a meeting alone with them. Given this and his repeated statements that we were not cooperating when we disagreed with him, his unauthorized requests that we alone pay his fees, we are unable to have any confidence in his fairness. In the

5

May 26th meeting with the referee at his office he actually told us that if we did not cooperate with him he would vote with the petitioners representatives on all issues and he and the petitioners will be running the Temple and "you will face the consequences." We believe that if he is allowed to proceed he will continue this prejudiced and illegal attempt to take control of the Temple along with the petitioners.

18. The July 6 meeting began with the Referee asking for the Temple mailing list, which he had told us to have available at that time. We gave it to him. No other copy was requested by anyone else.

19. We then gave him the draft membership application, which he had also requested us to bring, and we gave it to him.

20. He then said that he did not have a copy of the 1970 Bylaws, which are what he is supposed to be using to reorganize the Temple. I had to give him my copy. It was not returned to me.

21. The Referee said he wanted the membership fees to be as per the 1970 Bylaws. Everyone agreed.

22. The petitioners wanted the applications to be sent back to the Referee's P.O. Box. He overruled that and said they should be sent to the Temple. However at the next meeting he changed his mind about that.

23. The Referee said he would prepare a cover letter to go with the applications discussing the lawsuit etc. He said he would fax both sides his draft before the next meeting.

24. The Referee told us to prepare a revised membership form and fax it to the petitioners and him before the next meeting. We did this.

25. The petitioners wanted to be able to advertise to other persons outside the mailing list. We objected, but he overruled us and said they could do so, but the Temple did not have to pay for it. He also said the petitioners could solicit members anywhere, <u>even in the subways</u> if they wanted to.

26. The petitioners said they wanted anyone who returned the form to be able to vote, in absentia. We said we wanted them to meet with the Committee to see if they had a commitment to the Temple, etc. The Referee asked the petitioners how someone who lived in Texas and had only visited the Temple and did not participate could vote. He gave examples of his Protestant church in which only attending members can vote. He asked them if they would give everyone who paid three dollars the right to vote. They said yes. We said no. The Referee asked us to discuss it among ourselves and come to an agreement. He said, "then I am off the hook." He then left the room for a few minutes. When he came back there was still no agreement and he did not pursue the matter.

27. He then asked if the Managing Committee comes to some agreement on the qualifications of voting members would the respondents withdraw their appeal in Court. We said we would refer

7

the matter to our counsel. The Referee said voting members are different from visiting members.

28. Referee wanted members to vote in person. The petitioners said no, citing the 1970 Bylaws. The Referee said the 1970 Bylaws are difficult to follow and no clear procedures are given. He said you must change this. Petitioners said *they* will change the bylaws immediately after the elections. The Referee said he is going to look to the appellate decision in conducting the reorganization meeting and see whether that is beyond the scope of what the Bylaws say.

29. We then discussed mailing of the forms. It will take the mailing house at least four weeks to prepare the mailing to twenty-one thousand people. The petitioners could not agree on when they wanted the election.

30. The meeting of July 14 took place at 6:30 p.m. at the Referee's office. The atmosphere was heated from the beginning with the words of Referee "No meeting of minds and I have to decide now". Many times, Referee addressed the Plaintiffs and asked them their comments. He ignored our comments and his reply was short and curt to us: "I am following the Bylaws". He was impatient with us and ignored us comments, so much so that we had to repeat our comments and ask for his decision.

31. Referee opened the meeting stating "I thought that there was meeting of minds during the last meeting. But from the counsel's letter, it is obvious, there is no agreement. So let us look at the application form."

32.  Looking at our draft, the Referee asked about *the first point*-"Must be a Hindu". The other side objected to that stating that the bylaws permitted anybody to become a member. We wanted that to stay on the application. Aiyer said: The Temple's emblem reflects all religions and hence any one from any faith can become a member. Referee asked "Who is a Hindu"? Aiyer replied: "There is no definition of a Hindu. Even the Chief Justice of India has said that there is no definition of a Hindu and anybody can follow the Hindu faith. I have 3 American friends, who practice Hinduism and I have not converted them to be Hindus. Referee asked," Can you do conversion?" Aiyer replied "There is one group in India, who do the conversion but no body here." We said that this Temple was formed as a Hindu Temple and only Hindus understand and participate in the rituals, activities, as outlined in Article II of the 1970 Bylaws. The Referee read that article and finally said, "Okay, Hindu can stay" and looked at the Plaintiffs. They did not say anything. A vote was taken: 3 Plaintiffs—NO; 3-Respondents and Referee(4)- Yes.

33.  *Second point:* "Proactively participates in the various activities of the Society, by volunteering his/her services". The other side objected to that statement stating "Can only volunteers become member?" We replied "Yes, to know the people and to whom they vote for." The Referee said the Plaintiffs do not want this and per Bylaw, I do not want that also. After some discussions, Plaintiffs voted "NO" and we voted YES. The referee voted NO with the Plaintiffs, stating that "There is nothing in the bylaws about this. I may have added authority from the Court."

34.  *Third Point:* "Collectively works with other members to pursue the goals and objectives of the Society for which it stands": The other side objected to that statement saying "Can only

9

volunteers become member"? We replied "Yes, to know the people and to whom they vote for." Plaintiffs voted NO and we voted YES. Again Referee voted NO, with the Plaintiffs stating that there is nothing the bylaws.

35.  Fourth Point: "is willing to meet with the Managing Committee". The Plaintiffs voted NO and we voted YES. Again, Referee voted NO, with the Plaintiffs, stating that there is nothing in the bylaws.

36.  *Entrance Fee:* We asked for $ 101/-. They objected. They wanted "$0". We pointed out that the bylaws require an Entrance fee to become a member. Referee said, if you all agree to some number, it is okay with him; otherwise, the fee will be "$0" as Plaintiffs wanted. We again objected and stated at least it should be $ 11 to defray the costs. Referee said "NO, I decide it to be $0 and voted with the Plaintiffs."

37.  At this time, the Plaintiffs gave their version of the Application Form. Referee started making the corrections, as discussed above, on their Form.

38.  *Return Address for the Forms:* The Plaintiffs wanted to open a P.O. Box and to have it opened with one member present from each side. They do not trust the Temple. We objected to it stating that at the last meeting, the Plaintiffs agreed to have the forms sent to the Temple. The Referee said that there is no trust between 2 sides, therefore, he agrees with the Plaintiffs. HTS must open a PO Box latest by July 23 and let him know.

10

39. *Referee's covering letter- His draft:* We gave our 3 points. He did not agree to the deletion of 2nd sentence in the first paragraph of his draft. He wants to keep it. He will think over our suggestion of "become a member." He has deleted the "Optional Language" in his letter. At the suggestion of the Plaintiffs, he added a sentence "Only those who become members now will be entitled to vote in person or proxy for a new Board of Trustees at a meeting to fixed within the very near future". He then said "I am not sending any draft [of the covering letter] and I will decide what to say."

40. The applications are to be sent to all those on the mailing list, all twenty-one thousand people who ever signed the guest book. Plaintiffs wanted to distribute forms at the Temple. We replied that only those in the mailing list are to be contacted, as per Referee's interim report. But Referee said "NO, any one can become a member and distribute the forms at the Temple and keep a BOX to receive the completed forms. He looked at the Plaintiffs and asked "How big a box do you want". They said 2 feet x 2 feet. Then he turned to us and said" Make a box 2 x 2 and keep it in the Temple". Gandhi wanted 2 locks ( 1 for each side). Referee agreed to it immediately and said "Yes, 2 locks". In addition he said, "I will allow anyone coming to the Temple can pick up Form and become a member." He did agree that there would be no solicitation in the Sancto Sanctorum, although he had to be told what that meant.

41. The Referee asked how are you going to handle all the 21,000 pieces of mail. We said we could open the mail box after 9/30/04 and bring all the mail and the MC can meet and decide on membership. He agreed. But, the plaintiffs objected stating that the box will be full and they wanted to open the box every week on a Saturday or twice a week. We said, we are busy on

11

weekends and we are not available on all Saturdays. Referee replied "You have an important job here and you must do it. I cannot accept anything else. It is an order."

42. The Plaintiffs wanted to place advertisements in the newspapers soliciting members. We objected to that stating that the Bylaws do not permit this. He overruled stating that under the freedom of speech, they can advertise at their cost. We can also do it. Also, he will permit solicitation and distribute any material to the members who come to the Temple, as directed in his Interim Report, page 5. He told the Plaintiffs that if the Respondents object to any of the provisions in his Interim report, let me know so that he will order them to do so and said "I will get it done."

43. Then the Referee said, these are my directives to you:

   A. By 7/16/04, fax me the revised and corrected application form Temple letterhead.

   B. By 7/20/04, open a P.O. Box with 2 persons (Gandhi and Sundararaman) and let me know.

   C. 7/23/04: Prepare the final application form and sent it to the Mailing House, along with his covering letter. Give me the name and telephone number of the mailing house. The mailing should be done by 2nd or 3rd week of August/04 latest.

   D. 7/23/04: Keep blank application forms in the Temple for people to pick up.

   E. 7/23/04: Keep a Box of 2' x 2' in the Temple premises, to receive those applications. The box will have 2 locks- one by each side.

   F. The last date for the Application forms to be post-marked should be 9/30/04.

12

G.   Each week the P. O. Box and Drop off box are to be opened by the Managing Committee and vote on the membership acceptance. If there is tie, he will vote.

H.   The members should send the check along with the application form and do not cash it, until approved.

I.   The Plaintiffs can distribute any solicitation material in the Canteen and Auditorium area, as per my directives in the Interim report.

44. We asked him to give his directives in writing so that all can a copy. He refused stating, "If you want, you can take the notes," at which point I read the items and dates.

45. The flavor of the meeting was caustic and sour by his favoring the plaintiffs, asking and offering them that he will order the Respondents to do anything they want using his Interim report. That sounded like a direct challenge to us.

46. His statement during the discussion of the 2nd bullet point: "I may have added authority from the Court" gave us a feeling that they and court have discussed these issues before the meeting.

47. Since that meeting we have complied with all the directives given at the meeting, although it has been difficult to get clarification on such points as getting the Referee to confirm which application form to use.

Dated: August, 2, 2004
Flushing, New York

_____
Subramaniam Sundararaman

On August 2, 2004, Subramaniam Sundararaman, a person known to me, came before me and executed the foregoing affidavit.

_____
Notary Public, State of New York

DAMODAR R. BONDUGULA
Notary Public, State of New York
NO. 01BO6051315
Qualified in Queens County
Commission Expires Nov 20, 2006

# EXHIBIT 3

| | | |
|---|---|---|
| THE HINDU TEMPLE SOCIETY OF NORTH AMERICA, a New York religious corporation; NARENDRA DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; HYMA REDDY; DR. PATHMINI PANCHACHARAM; DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH SHANTILAL PANCHAL; RAJ GOPAL IYER,<br><br>                Plaintiffs,<br><br>         v.<br><br>THE SUPREME COURT OF THE STATE OF NEW YORK, ANTHONY J. PIACENTINI, in his official capacity; JOSEPH G. GOLIA, in his official capacity; SAMBASIVA RAO VENIGALLA; KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA, NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER, and VASANTRAI M. GANDHI,<br><br>                Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. |

## AFFIDAVIT OF PLAINTIFF NARENDA DESAI

Mr. Narenda Desai, on oath, deposes and says:

1. I am a devotee, volunteer and volunteer at the Hindu Temple Society of North America ( the Temple) and a member of its Executive Committee and other committees. I am not a party to the State court proceedings.

2. My association as a devotee of the Temple began in 1980. In 1982 I was married there. I have been a frequent and regular attendee since mid 1984 and a volunteer for the last 15 to 20 years.

I was invited to join the Executive Committee in about 2000.

3. Serving on the Executive Committee involves a lot of work obligations but does not give rights to vote, or otherwise make policy for the Temple. It is undertaken as a form of devotion to the God.

4. The principal purpose of Hindu religious practice is to purify oneself of grasping and personal concerns through devotion to the God (which term refers to all Go5svadd all things together) and thereby raise ones spiritual state. The Temple exists to create a proper atmosphere for that, and it is important that it remain free of distractions or activity which is contrary to the sort of spiritual goals that it pursues.

5. It is for those reasons that political activity, electioneering, and outside influences must be avoided. They corrupt the sacredness of the Temple atmosphere. Outside influences would interfere with your relationship with your gods.

6. It is especially disturbing to me and the other devotees that non-Hindus are inserting themselves into the running of the Temple. These are profaning the Temple and distracting and upsetting the devotees.

7. Even when the Muslims and the British conquered India they did not try to tell us how to run our Temples or put their own people in charge. For about five thousand years

Hindu Temples have been run by Hindus who have demonstrated their devotion to the God. The question of how the Temple is run and who is entitled to decide who should have that trust is a sacred one and should not be made for reasons other than spiritual. It should not be decided by outsiders.

8. The fact that the State court is telling us how to organize our Temple, imposing itself in those spiritual matters and dragging outside influences into out Temple is also very upsetting to the devotees. I have been made to feel that we as Hindus are not being accorded the same rights to free exercise of our religion and separation of church and state that are accorded to other religions. Do the freedoms of America apply to us or not? Even under conquerors we had more religious freedom than this.

9. It is also upsetting to me, and to other devotees, that their names addresses, birth dates, marriage dates, contribution records etc– which are all part of the mailing list database- will be given to outsiders. They feel that this is a breach of their privacy and sullies their relationship with the Temple. Why people go to the Temple may be confidential and information in the database certainly is. They gave it to the Temple for a variety of reasons, including so that offerings could be made for them on important anniversaries, and so that they could be kept informed of worship and festival schedules, etc. They do not want it disclosed, especially now when Hindus are often subject to "spill over" hostility toward Muslims.


Dated this 28th day of June, 2004

At New York, New York.

Marenda Desai

Subscribed and sworn before me this 28th day of June, 2004.

_____
Notary Public

ROBERT L. GREENE
Notary Public, State of New York
No. 02GR4935687
Qualified in New York County
My Commission Expires November 2, 20__

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| THE HINDU TEMPLE SOCIETY OF NORTH AMERICA, a New York religious corporation; NARENDRA DESAI; MATHY PILLAI; NIRMALA RAMASUBRAMANIAN; HYMA REDDY; DR. PATHMINI PANCHACHARAM; DR. BRAHMAN SIVAPRAKASA PILLAI; KRISHNASWAMY ANANDARAM; DR. UMA MYSOREKAR; DR. GADDAM DASARATHARAM REDDY; DR. CHITTI RAMAKRISHNA MOORTHY; SHIVAKUMAR KUSUMA PRABHAT; VIJAY KHANNA; SUBARAMANIAM SUNDARARAMAN; LAKSHESH SHANTILAL PANCHAL; RAJ GOPAL IYER, <br><br> Plaintiffs, <br><br> v. <br><br> THE SUPREME COURT OF THE STATE OF NEW YORK, ANTHONY J. PIACENTINI, in his official capacity; JOSEPH G. GOLIA, in his official capacity; SAMBASIVA RAO VENIGALLA; KATTINGER V. RAO; ANAND MOHAN; VENKAIAH DAMA, NEHRU E. CHERUKUPALLI; KRISHNAMURTHY AIYER, and VASANTRAI M. GANDHI, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO. |

# AFFIDAVIT OF WILLIAM J. BURKE, ESQ.

William J Burke, Esq., on oath deposes and says:

1. I am an attorney licensed to practice law before the Courts of New York State. I am counsel to the Hindu Temple Society of North America, Inc., and its Trustees in the State Court Proceedings known as Venigalla v. Nori, having the Supreme Court Index Number 15676/01.

2. In that capacity I have attended all Court proceedings and filed all documents on behalf of the Respondents in that action in both the Supreme Court, Queens County and the Appellate Division, Second Department since the case went to the Appellate Division in 2003.

3. I have raised the Constitutional issues that are involved in this case in my briefs to the Appellate Division, Second Department in 2003, and subsequently on a number of occasions in submissions to Justice Golia and meetings with Mr. Piacentini. The only reference or response they have made to those arguments was in the denial of Mr. Storzer's pro hac vice application, in which Justice Golia wrote: that "this Court finds no such violation of the First Amendment or an entanglement of any kind."

4. Justice Golia has only been present on one occasion. The June 22, 2004, meeting was the conference ordered in the June 10 order. Justice Golia attended only the final five minutes of a conference, which had lasted for hours. On no other occasion have we had a hearing or conference before the Judge, or any other verbal communication with him.

5. At that June 22 meeting the Referee was quite contentious when our objection to his fee was discussed. He stated that he had a heavy office rental expense, and demanded to know what my hourly rate was. I was the only one on the Temple's side attending the meeting.

6. On December 22, 2003, the Referee held a meeting, the third with both counsel at his office. Joe Baum and I attended for the Temple. It became clear during the meeting that the Referee was going to go forward with mailings to the Temple's mailing list to determine the question of membership--all this without a court reporter. I objected to the process, claiming that the Referee was acting beyond the scope of his reference and without subject matter jurisdiction. The Referee then turned to Mr. Chittur (counsel for the petitioners) and said, in substance: "You know what I need. Send me backup."

7. Mr. Piacentini refuses to allow counsel to assist parties who are members of his "Managing Committee" during the Committee meetings, although he has not put that in writing.

8. Upon information and belief, he does not appear to keep minutes of the meetings either and has never offered such minutes to counsel, or referred to them in correspondence. His proceedings are entirely verbal and apparently without any record.

9. Upon information and belief, on July 6, 2004, he became visibly angry when members of the Committee were taking notes, and he refused to make a record himself.

10. Referee Piacentini has expressed his reluctance to have a court reporter at those meetings and has never done so. In his letter of July 7, 2004 (attached as EXHIBIT 30) he indicated that he would have one, but seems to require that a majority of the Managing Committee agree to it Since the petitioners in that proceeding are opposed to court reporter making a record of the meetings that concession would appear to be meaningless. My response to that letter is attached as EXHIBIT 31.

Dated  August 4 , 2004
New York, New York

William J. Burke

On August    4  , 2004, William J. Burke, a person known to me, came before me and executed
this Affidavit.

_____
Notary Public, State of New York

ENRICO G. ARTEFICIO
Notary Public, State of New York
No. 31-4978861
Qualified in New York County
Commission Expires March 11, _2007

# EXHIBIT 5

**AFFIDAVIT OF SHIVAKUMAR K. PRABHAT**

SHIVAKUMAR K. PRABHAT, upon oath, deposes and says:

1. I am a Trustee and Treasurer of the Hindu Temple Society of North America ('The Temple'), a Respondent in the State Court Proceedings and am one of the Temple's three representatives to the Referee's Managing Committee as per his interim report dated January 6, 2004. Following the directive of the Appellate Court in August 2003, to the Supreme Court Queens County, the referee was directed to hold a reorganization meeting to elect a new Board of trustees under the so called '1970 Bylaws'.

2. In this capacity I attended a meeting of the Managing Committee on July, 14, 2004 at the Referee's office.

3. The Referee seemed hostile to us, saying that since there was no meeting of the minds he would make the decisions.

4. There were several items concerning the application form that he wants to send out. After the July 6 meeting he had told us to redraft it and we did so based on what we thought he had discussed at that meeting. However he seemed to have changed his attitude.

5. The first of these things we discussed was the entrance fee. The draft of the "1970 bylaws' provide for an entrance fee, but since they were never discussed or adopted the space for the amount is left blank. I requested the referee that the entrance fee should be $101, a figure which has significance to Hindu people--- since numbers ending in zero are frowned upon and odd numbers are preferred. The plaintiff's objected. Mr. Ayer said he wanted $5, Mr. Gandhi wanted zero. I objected to that and said I am prepared to accept $25. Referee told us that 1970 bylaws has a blank and hence no entrance fee. So the Referee overrode all of us, except Mr. Gandhi, and declared that there would be no initial fee to become a member of the Temple, even though the "1970 bylaws" contemplated some such fee.

6. The plaintiffs in the state court action had said they wanted to distribute application forms all over and at the Temple. At the meeting on the 6th the Referee told them they could distribute them wherever they wanted including handing them out in the subway. On the 14th I strongly objected that there should be no distribution of election materials or soliciting in the "Sancto Sanctorum" of the temple. The plaintiffs said they will distribute the materials in the lower level of the temple I objected again. The referee could not understand the word "Sancto Sanctorum" I explained what it is, then the referee asked the plaintiffs to reconsider, we all agreed that the materials will be distributed in the Canteen and Auditorium.

7. Referee wanted our next meeting on July 21st. I told the referee that I will be on vacation and I had booked the tickets in April 2004 and will be returning on July 31st. Referee told us then there will be only two from your group. I objected to that and told him that there will be an imbalance of 2 against 3. I also told him that I had informed him of my vacation in my earlier meeting last week and he cannot be dictatorial, like a prison guard or a police officer. Referee relented and agreed for August 4th. Again I had to raise my objection to the time of the meeting. Referee wanted before 5pm and we said no, we have to work and have other commitments. Then again I have to insist to him that I have to get to his office in Port Washington from Manhattan and it is impossible to meet him earlier without losing my job. Referee agreed to 6.30pm meeting on August 4th.

8. I am also the Treasurer of the Hindu Temple Society of North America, Inc., and as such I am responsible for overseeing the Temple's accounting practices. I have been responsible for this work for approximately nine years.

9. Contrary to the falsehoods spread by the plaintiffs in the state court action, the Temple has unusually extensive financial controls and regularly makes its audited financial reports public to anyone who cares to come and see them. What follows is a description of the controls and the public exposition of them.

10. ACCOUNTING PROCEDURES FOLLOWED

A. Internal Controls:

    a. Daily entries are made in the Temple Management System in the computer in their respective categories and the account is closed at the end of the day.

    b. At the beginning of every week all the daily reports of the previous week are reviewed by the President.

    c. Books of accounts are maintained in the computer using Peachtree Accounting software and accrual basis of accounting is followed.

    d. On a regular basis all the invoices are entered into Peachtree by the internal bookkeeper.

    e. On biweekly or monthly basis checks are issued to the vendors, as per their due dates.

    f. On a regular basis deposits are entered into Peachtree based on deposit reports generated from the Temple Management System.

    g. On a monthly basis all the reports are reconciled in order to match with bank statements.

B. External Controls:

    h. Books of accounts are examined by an external accountant, a CPA, Mr. Satish Sakhuja, at the end of each month. The external accountant reviews on monthly basis books of accounts to ensure all bank statements are properly reconciled and all the taxes are duly paid.

    i. At the end of every month a meeting is scheduled between the President, Treasurer, and the External Accountant to review monthly accounts, cash flow position, financial statements, and compare the financial statements with those of the previous year.

    j. In addition to the above, a yearly audit is conducted by an independent auditor also a CPA, Mr. Ira Fleck of Ira Fleck & Associates in February/March of the following year and after completion of audit the independent auditor prepares an audited report.

11. Annual Assembly. Every year in the month of December an Annual Assembly is convened by the Temple Society. Notices of the Annual Assembly are sent to all the devotees on the mailing list at least 3 weeks in advance. The Office Bearers of the Temple Society submit Annual reports and the financial statement of the first 3 quarter of the current year. Audited reports of the preceding year are placed in the registration desk for devotees to review if they chose to. The Annual Assembly gives an opportunity for the devotees to ask questions on any of the issues and also give suggestions. I do not know whether the state court plaintiffs have never bothered to

attend the assemblies or whether they are deliberately spreading falsehoods in accusing the Temple of not disclosing its financial affairs. I do not know whether the state court plaintiffs have ever bothered to attend the assemblies or whether they are deliberately spreading falsehoods in accusing the Temple of not disclosing its financial affairs.

Dated July 17 , 2004.

Flushing, New York

SHIVAKUMAR K. PRABHAT

On July 17 , 2004, SHIVAKUMAR K. PRABHAT, a person known to me, came before me and subscribed this Affidavit.

_Damodar R. Bondugula_
Notary Public, State of New York

DAMODAR R. BONDUGULA
Notary Public, State of New York
NO. 01BO6051315
Qualified in Queens County
Commission Expires Nov 20, 2006

# EXHIBIT 6

State of New York
Department of State } ss:

*I hereby certify that the annexed copy has been compared with the original document in the custody of the Secretary of State and that the same is a true copy of said original.*

*Witness my hand and seal of the Department of State on* JAN 14 2000



Special Deputy Secretary of State

### CERTIFICATE OF INCORPORATION
### OF
### THE HINDU TEMPLE SOCIETY OF
### NORTH AMERICA

Pursuant to Article 9 of the Religious Corporations Law.

1. The name or title by which the Society shall be known shall be THE HINDU TEMPLE SOCIETY OF NORTH AMERICA.

2. The purpose of its organization is to found and continue a Hindu Free Church in the City of New York, County of Queens, for the purpose of promoting and establishing a place of worship in New York as a permanent place for holding religious and cultural congregations, to conduct religious discourses, and institute meditation centers celebrating religious festivals, conducting religious classes, and facilities for conducting marriage ceremonies.

3. The names of HILDA CHARLTON, MARION F. LEVY, DOUGLAS McQUEEN GRANT, ANN MEUER, BARBARA STOLER MILLER, JAMES JOSEPH GERAGHTY, ERNST C. GRIGG (Seven Trustees of whom not less than five are persons who are not Ministers of the Gospel or Priests of any denomination) to manage the same, their names and addresses being set forth below:

HILDA CHARLTON, residing at
865 West End Avenue
New York, N.Y. 10025

MARION F. LEVY, residing at
1075 Park Avenue
New York, N.Y. 10028

DOUGLAS McQUEEN GRANT, residing at
231 Clinton Street
Brooklyn, New York 11201

ANN MEUER, residing at
246 East 54th Street
New York, N.Y. 10022

BARBARA STOLER MILLER, residing at
175 Riverside Drive
New York, N. Y. 10024

JAMES JOSEPH GERAGHTY, residing at
15 Nassau Street
Floral Park, N. Y.

ERNST C. GRIGG, residing at
Tudor City, Apt. 7E North
New York, N.Y. 10017

4. The County in which the Temple shall be located shall be the County of Queens, City and State of New York.

5. The principal office of the Trustees is to be located at 84-39 Kendrick Road, Jamaica Estates, New York 11432.

6. All the subscribers hereto are of full age; that they are all citizens of the United States and residents of the State of New York; and that no previous application has been made to any Justice of the Supreme Court for an Order approving the foregoing Certificate of Incorporation and consenting that the same be filed.

IN WITNESS WHEREOF, we have executed and acknowledged this Certificate this 16 day of February, 1970.

HILDA CHARLTON

MARION F. LEVY

DOUGLAS McQUEEN GRANT

ANN MEUER

BARBARA STOLER MILLER

JAMES JOSEPH GERAGHTY

ERNST C. GRIGG

STATE OF NEW YORK )
: ss.:
COUNTY OF _New York_ )

On the 'C day of _____, 1970, before me personally came HILDA CHARLTON, to me known and known to me to be the individual described in who executed the foregoing instrument and acknowledged that she executed the same.

_____

STATE OF NEW YORK )
: ss.:
COUNTY OF _New York_ )

On the 'C day of _____, 1970, before me personally came MARION F. LEVY, to me known and known to me to be the individual described in who executed the foregoing instrument and acknowledged to me that she executed the same.

_____

STATE OF NEW YORK )
: ss.:
COUNTY OF _New York_ )

On the 'C day of _____, 1970, before me personally came DOUGLAS McQUEEN GRANT, to me known and known to me to be the individual described in who executed the foregoing instrument and acknowledged to me that he executed the same.

_____

STATE OF NEW YORK )
: ss.:
COUNTY OF _New York_ )

On the 'C day of _____ 1970, before me personally came ANN MEUER, to me known and known to me to be the individual who executed the foregoing instrument and acknowledged to me that she executed the same.

_____

- 3 -

815566 — S

Index No.

cal 19

---

CERTIFICATE OF INCORPORATION

OF THE HINDŪ TEMPLE SOCIETY

OF NORTH AMERICA,

---

CERTIFICATE OF INCORPORATION.

---

EDWARD C. CLARKE

*Attorney for*

Trustees

*Office and Post Office Address, Telephone*

37-14 90th STREET

JACKSON HEIGHTS 11372

N. Y. CITY, N. Y

TW 9-1233

To

_____

*Attorney(s) for*

Service of a copy of the within

Dated,                                is hereby admitted.

_____

*Attorney(s) for*

---

STATE OF NEW YORK
DEPARTMENT OF STATE
FILED FEB 17 1970

---

**NOTICE OF ENTRY**

Sir:—Please take notice that the within is a (certified)
true copy of a
duly entered in the office of the clerk of the within
named court on
Dated,

Yours, etc.,

EDWARD C. CLARKE

*Attorney for*

Office and Post Office Address

37-14 90th STREET

JACKSON HEIGHTS 11372

N. Y. CITY, N. Y.

To

_____

*Attorney(s) for*

19

---

**NOTICE OF SETTLEMENT**

Sir:—Please take notice that an order

of which the within is a true copy will be presented
for settlement to the Hon.
one of the Judges of the within named Court, at

on the          day of

at          M.

Dated.

Yours, etc.,

EDWARD C. CLARKE

*Attorney for*

Office and Post Office Address

37-14 90th STREET

JACKSON HEIGHTS 11372

N. Y. CITY, N. Y.

To

_____

*Attorney(s) for*

---

1969 DIVER, PRESS SUPPLIERS, INC., 80 ELEANOR PLACE, N.Y.

# EXHIBIT 7

# ARTICLE I

## General

### Name

1. The Society shall be known as "The Hindu Temple Society of North America". The term 'Society' wherever it appears in this text shall mean the full name and title as mentioned earlier in this article.

### The organs

2. The Board of Trustees is the highest organ responsible in law for the Society. The Board of Trustees will have as its executive arm a Managing Committee. The Board of Trustees and the Managing Committee will be elected by and be responsible to the General Body composed of all members of the Society in good standing.

## ARTICLE II

1. The Society is organized for the following purposes:

    (a) In the first instance to establish and to maintain with appropriate dignity a hall of worship in New York as a permanent place for holding religious and cultural congregations, and to eventually endeavour to establish a Hindu temple according to known and accepted practices;

    (b) To organize religious discourses, philosophy and religious text classes, meditation classes and bhajans;

    (c) To arrange for publications in subjects connected with religious and cultural matters, keeping in mind the interests of children and young adults;

    (d) To offer facilities for language studies and instruction in Indian dance and music;

    (e) To promote inter-religious social and cultural understanding

    (f) To organize music festivals as far as possible in co-operation with existing cultural organizations in the New York metropolitan area.

2. The premises of the Society may be used for other purposes including the solemnization of marriages and similar ceremonies which are consistent with the purposes referred to in paragraph 1 of this Article.

# ARTICLE III

## Membership and Voting: Qualifications

### Qualifications

1. All persons who have attained the age of 18 years or more may be admitted to membership, irrespective of colour, race, religion, sex or nationality. The procedure for obtaining membership is outlined in para. 3 of this Article.

### Types of membership

2. Membership will be either resident or non-resident, and family or single. Those who live within a radius of fifty miles of New York City will be eligible for resident membership.

### Applications for membership

3. Upon written application, with an undertaking to abide by the purposes and the objectives of the Society as formulated in the by-laws, and an entrance fee of $         , the Managing Committee or its appropriate sub-committee will approve membership applications by majority of those present.

### Membership fees

4. The annual membership fee will be $3.00 for non-resident single persons, $5.00 for non-resident families and resident single members, and $10 for resident family members.

### Membership in force

5. Membership will be in force until such membership is voluntarily discontinued, or the dues are not met.

6. Membership can also be discontinued if the Managing Committee makes such a determination. If this be the case, this decision should be confirmed by the Board of Trustees at its earliest meeting. The decision should be reported to the next General Body meeting and must be approved by a majority of those present and voting.

### Right to vote

7. Only members of the Society who have paid their annual dues will be eligible to vote at the annual or other meetings.

### Types of voting

8. Normally a simple majority of those present and voting will be sufficient to make decisions at the General Body meetings.

9. The two exceptions to the above rule will be (a) elections

to the Board of Trustees and to the Managing Committee, and (b)
changes, alterations or amendments to the by laws. In these
cases absentee ballots from duly qualified members, and duly
authorized votes or written opinions will be accepted.

## ARTICLE IV

### The General Body

#### Composition

1. The General Body will be composed of all members in good standing who have paid their annual dues.

#### Functions of the General body

2. The members of the General Body will lay down the general principles and policy guidelines for the management of the Society. The members of the General Body shall elect members of the Board of Trustees, members of the Managing Committee, members of the Auditing Committee, adopt or ratify the by laws and decide upon the questions referred to them. They will approve the financial and audit reports.

#### Annual meetings of the General Body

3. The annual meeting of the General Body shall be held in the fourth quarter of the year.

4. Advance notice of at least thirty days shall be given to the members indicating date, time, place and agenda of the annual meetings of the General Body.

5. The inclusion of a specific item on the agenda will be made upon written request from at least 10% of the members.

#### Extraordinary meetings

6. The Secretary of the Managing Committee shall act within fifteen days upon a written request by at least twenty five members to convene a meeting of the general body to discuss specific questions. The meeting shall be convened within a total period of one month.

7. In special cases, if warranted by extraordinary circumstances, the Board of Trustees or the Managing Committee may call a meeting, giving at least fifteen days notice, to discuss important issues.

## ARTICLE V

## The Board of Trustees

### Composition and election

1. The Board of Trustees shall consist of not more than eleven trustees, at least five of whom will be U.S. citizens.

2. All the trustees/ including the U.S. citizens who are trustees shall hold office for a period of three years and will be eligible for re-election. In the first year four trustees, decided by lot or by voluntary resignation, will offer themselves for re-election. Each year at least three posts of trustees will be available for election.

3. The trustees may co-opt not more than four trustees including non-U.S. citizens if need be, subject to the maximum number of eleven trustees set forth in law. The co-opted trustees will continue in office until the next annual General Body meeting when they will offer themselves for election to continue in office.

### Functions.

4. The Board of Trustees will meet at least twice a year to review progress and take decisions on the activities of the Society based on the report and recommendations presented by the Managing Committee. The Board of Trustees will approve reports including the financial report for presentation to the General Body.

5. The Board of Trustees may authorize its officials to raise loans on conditions defined by it for specific purposes.

6. Assets and liabilities of the Society shall vest in the Board of Trustees and be administered ~~jointly by the Board~~ /by the Managing Committee/ on behalf of the Board of Trustees However, no member of the Board of Trustees or the Managing Committee shall be personally held responsible for any liability of the Society.

### Meetings

7. All the decisions in the meetings of the Board of Trustees shall require a majority of the trustees, in good standing, present and voting. Presence of at least five trustees in good standing shall constitute the necessary quorum for the meetings of the Board of Trustees. A trustee may authorize another trustee to vote on his behalf on a specific question provided such authorization

is given in writing specifying the questions to be voted upon.

## Officials and their functions

8. The Board of Trustees will elect its Chairman. The Chairman will preside over the meetings of the Board of Trustees. He will have equal rights and responsibilities as other members of the Board of Trustees.

9. The Secretary of the Board of Trustees, who will also serve as the Secretary of the Managing Committee shall be a duly elected member of the Board of Trustees. The Chairman of the Board of Trustees and other members of the Board will be consulted by the Secretary prior to convening meetings of the Board of Trustees.

## Relationship with the Managing Committee

10. The Board of Trustees will be advised by a representative Managing Committee on the implementation of the objectives of the Society. The President, Secretary (who will also be a member of the Board of Trustees) and Treasurer who are members of the Managing Committee, will participate in the meetings of the Board of Trustees.

# ARTICLE VI

## Managing Committee

### Composition

1. The Managing Committee is the executive arm of the Board of Trustees. It will be a representative body having a President, three Vice-Presidents, one of whom two will be honorary and co-opted by the Board of Trustees, a Secretary, a Treasurer and twelve members, of whom five will be co-opted ex-officio representatives of existing cultural and religious organizations in the New York area.

### Election and confirmation

2. The President and other members of the Managing Committee will be elected by the General Body at its annual meeting and confirmed by the Board of Trustees. Members of the Managing Committee will hold office for a period of three years or as otherwise specified. One third of the Managing Committee will be renewed each year. Members of the Committee may offer themselves for re-election.

### Functions

3. The Managing Committee will endeavour to achieve the purposes connected with the temple as enumerated in Article II. The Managing Committee shall establish sub-committees as may be appropriate and necessary to develop the different activities.

4. The Managing Committee, on behalf of the Board of Trustees, is empowered to accept contributions, gifts, estates, real estate, donations, grants, aid etc. on behalf of the Society.

### Meetings

5. In consultation with the President of the Managing Committee, the Secretary shall convene the meetings of the Committee. The Committee shall meet at least twice a year. The meetings of the Committee will be presided over by the President or by a Vice-President designated by him. The rules of procedure outlined in Article V(5) for the conduct of the meetings of the Board of Trustees will be applied to the meetings of the Managing Committee with appropriate modifications as may be necessary. Honorary Vice-Presidents may participate in the meetings without having the right to vote. Voting procedures established in Article III will be followed as appropriate.

## Officials and their functions:
### President

6. The President of the Managing Committee will receive frequent reports from the Secretary, the Treasurer and the Sub-Committees. The President of the Managing Committee will take the decisions for the maintenance and day to day administration of the temple. He will exercise over-all control and supervision in the management of the Society. The President may appoint individuals to render part-or full-time paid services to the Society as may be required from time to time

### Vice-Presidents

7. In the event of the absence of the President from New York a Vice-President designated by the President will exercise the functions of the President. The President may also designate a Vice-President to represent him or to preside over the General Body or the meetings of the Managing Committee, or any of its sub-committees.

### Secretary

8. The Secretary shall be responsible for the maintenance of all records, documents, registers and other official papers of the Society. He shall keep records of the meetings of the Board of Trustees, the Managing Committee and the General Body meetings. He shall prepare the agenda of the various meetings with appropriate consultations as may be necessary. He shall prepare the necessary progress reports to keep the members informed about the activities of the Society at periodic intervals.

### Treasurer

9. The Treasurer shall collect dues, keep accounts of all the receipts and expenses, deposit all funds received in the name of the Society. He shall also be one of the co-signers of the checks and make payments in the name of the Society as may be authorized by the President and Secretary of the Managing Committee.

## ARTICLE VII

### General

1. The fiscal year of the Society shall conform to the calendar year (January 1 to December 31).

2. Periodical financial audit and progress reports shall be circulated to members from time to time at least once a year.

3. The Audit Committee elected by the General Body, or the Certified Public Accountant appointed on the recommendation of the Audit Committee, as the case may be, shall submit audit reports at least once a year.

## ARTICLE VIII

1. A register of founder members (those who contrib uted
and above) shall be maintained in the premises.

## ARTICLE IX

### Amendments

1. Suggested changes, alterations or amendments in the by laws must be approved by the General Body meeting. Proposals for changes alterations or amendments in the by laws may be made in a written form by the Board of Trustees, the Managing Committee or at least ten members of the Society.

2. Adequate time must be given for consideration by members of the suggested changes, alterations or amendments. Such proposals shall be circulated well in advance and definitely not less than fifteen days before consideration at the General Body meeting.

3. At least two thirds of the votes cast by the members shall be needed to approve the proposed changes, alterations or amendments.

4. Absentee members may also participate in voting on changes, alterations or amendments in the by laws by furnishing written authorization as required.